No. 45,239

Constance K. Wiles, *Appellee* and *Cross-Appellant*, v. Richard E. Wiles, *Appellant* and *Cross-Appellee*.

(452 P. 2d 271)

Opinion filed March 8, 1969.

*Robert P. Anderson*, of Olathe, argued the cause, and *John H. Johntz, Jr.*, of Olathe, and *John H. Foard*, of Kansas City, Missouri, were with him on the briefs for the appellant and cross-appellee.

*Patti Karger*, of Newport Beach, California, argued the cause, and *John W. Breyfogle, Jr.* and *Hugh Kreamer*, of Olathe, were with her on the brief for the appellee and cross-appellant.

The opinion of the court was delivered by

O'Connor, J.: This appeal involves a settlement agreement entered into by the plaintiff, Constance K. Wiles, and the defendant, Richard E. Wiles, on May 27, 1966, relating to alimony, division of property, and child support. The agreement was approved by the district court and incorporated in a decree of divorce rendered on the same date.

Subsequently, a dispute developed between the parties concerning certain provisions of the agreement. On January 23, 1967, plaintiff filed a motion requesting the district court to construe portions of the agreement and order defendant to comply with the terms thereof. Following a hearing on the motion, the court entered an order on June 30, 1967, with respect to (1) household goods to be

delivered to plaintiff, (2) dividend money to be paid to plaintiff, (3) shares of American Tobacco Company stock to be delivered to plaintiff, and (4) assignment of life insurance policies on defendant's life to secure child support payments. Defendant has appealed from that part of the order with regard to the first three items, and plaintiff has cross-appealed from the portion pertaining to the fourth.

The case was here previously on an appeal by defendant from an award of attorneys' fees for plaintiff's attorneys (*Wiles v. Wiles,* 200 Kan. 574, 438 P. 2d 81). That opinion contains many of the salient facts concerning the financial status of the parties. They were people of substantial means. Their combined assets totaled approximately $1,600,000, of which plaintiff's separate property amounted to about $200,000. In addition, defendant owned life insurance having a face value of $150,000 and a cash value in excess of $76,000. On defendant's fortieth birthday—July 29, 1966—he came into possession of stocks valued at over $900,000 previously held for his benefit in a trust established by his grandfather.

The settlement agreement generally provided that plaintiff, in addition to her separate property, was to receive stock valued at $550,000, a sum not to exceed $75,000 in cash to be used in the purchase of a home, and most of the household goods and furnishings in the home previously occupied by the parties. Plaintiff was to have custody of the four minor children, and defendant agreed to pay child support for each child in the amount of $2,500 per year, said payments to be secured by defendant assigning to plaintiff certain life insurance policies on his life.

With this background we now turn to the points raised by each of the parties in relation to the specific provisions of the settlement agreement which are in controversy.

Defendant first complains of the district court's order relating to household goods and furnishings to be delivered to plaintiff. We find that under the settlement agreement defendant was to receive the home in Mission Hills as his sole and separate property, and plaintiff was to have all of the household goods and furnishings except certain listed articles which were to be retained by defendant. Plaintiff was given the privilege of selling at the home any of the household items set over to her, and was to remove at her expense any remaining items when she moved from the premises.

Shortly after the divorce plaintiff went to California, and pursuant to an oral understanding between the parties, defendant

shipped to her approximately 282 items from the home. Plaintiff in her motion alleged defendant failed to deliver to her certain items to which she was entitled under the terms of the agreement. At the hearing on the motion defendant admitted many of the articles had not been shipped for various reasons which, to him, were justifiable. The district court, however, found plaintiff was entitled to those items she claimed, and ordered defendant to send them to her at her expense. Defendant has appealed from that part of the district court's order, contending he has substantially complied with the terms of the agreement. The items in dispute are too numerous to discuss in detail. We have, however, reviewed the record and the arguments advanced, and conclude that the district court properly found plaintiff was entitled to all items of household goods and furnishings claimed by her except a chaise lounge and two iron beds which did not belong to either of the parties. To that extent the order must be modified.

Defendant next assigns as error the lower court's order regarding dividend money to be paid to plaintiff. The settlement agreement called for delivery by defendant to plaintiff of certain corporate stocks within ninety days after May 27, 1966, and further provided, in part:

". . . The Plaintiff shall be entitled to receive all dividends of every kind and nature whatsoever declared after this date on the stocks assigned and delivered to her by Defendant pursuant to this agreement and any such dividends received by Defendant prior to such assignment shall be paid by him to Plaintiff at the time of delivery of said stocks."

Another portion of the agreement stated:

". . . Plaintiff has agreed to accept the transfer of securities hereinbefore referred to together with dividends thereon in lieu of further support payments or alimony. However, the Defendant agrees to advance to Plaintiff the sum of $1,000.00 per month commencing with June 1 of this year until delivery of the securities to which Plaintiff is entitled pursuant to paragraph 6 of this agreement together with dividends thereon is made. The Defendant shall be reimbursed for such advancements by retaining an amount equal thereto from the dividends due Plaintiff."

The parties agreed the total amount of dividends due plaintiff under the terms of the agreement was $5,882.11, and defendant had paid plaintiff four monthly payments totaling $4,000. This left a difference of $1,882.11 in dividend money owing to plaintiff.

As previously indicated, under the terms of the agreement plaintiff was given the privilege of selling at the home household goods and furnishings set over to her, and any items remaining were

to be moved *at her expense.* The day after the agreement was signed the parties reached an oral understanding to deviate from this provision of the written agreement. The substitute arrangement is best described by plaintiff's own testimony. Plaintiff had planned to have a garage sale at the home to obtain money for moving her furniture to California. A garage sale did not meet with defendant's approval. Plaintiff expressed her willingness to forego the sale and leave her furniture in the home for defendant and the children to use until she was ready for it, if defendant would pay for the crating and shipping thereof to California. Defendant agreed and gave plaintiff a check for $3,000 as a down payment on the moving expense.

In early November 1966 the parties were before the district court on some type of hearing, the nature of which is not clear from the record. There was testimony at that hearing concerning the substitute oral agreement, and the court ordered defendant to ship the furniture to plaintiff in California *at his expense,* which he subsequently did. The result was that the $3,000 was never used by plaintiff to pay any part of the shipping costs. The matter of the oral agreement and its precise terms was again aired at the hearing of plaintiff's present motion. Both parties testified substantially the same regarding the terms of the agreement as above outlined. Defendant's contention that he was entitled to claim the $3,000 paid plaintiff as a setoff against the $1,882.11 balance of dividend money due her was rejected by the district court. We believe the court erred in this respect. All of the testimony at both the November hearing and the hearing on plaintiff's present motion was to the effect the $3,000 was a down payment on the shipping expense. Despite this testimony the district court apparently determined the money was paid to plaintiff solely as consideration for her agreeing to forego a garage sale at the home and leave the furniture for the remainder of the summer. This conclusion is contrary to the evidence. Plaintiff now argues the district court's determination of the matter at the earlier hearing in November was *res judicata* and the subject cannot now be raised in the present appeal. We do not agree. It would appear that the November proceeding was merely an interim hearing regarding delivery of the furniture and did not encompass an accounting of funds due either of the parties.

The next point urged by defendant relates to the number of shares of American Tobacco Company stock which the district

court found plaintiff was entitled to under the terms of the settlement agreement.

Paragraph 6 of the agreement provides as follows:

"As a further and final division of property and in full satisfaction and in lieu of support and all alimony to which Plaintiff might otherwise be entitled in the event she is granted a divorce, the Defendant agrees within ninety (90) days from this date to assign and deliver to Plaintiff shares of corporate stock selected from those described and listed on Schedule 3 hereto attached and made a part hereof having a total aggregate value, determined as hereinafter provided, of $550,000.00. The 'per share value' for each such share, as set forth on said Schedule 3 shall be the value used in determining the number of shares needed to make up said total aggregate value of $550,000.00. The shares to be delivered under this paragraph shall be either—

(*a*) All of the shares described and listed on said Schedule except the shares of Sunshine Biscuits, Inc. plus sufficient shares of Sunshine Biscuits, Inc. to make up the said total aggregate value of $550,000.00; or

(*b*) One-half of each type of shares described and listed on said Schedule except the shares of Sunshine Biscuits, Inc. plus sufficient shares of Sunshine Biscuits, Inc. to make up the said total aggregate value of $550,000.00,

at Defendant's option. It is understood that if through stock dividends, stock splits or mergers occurring prior to said assignment and delivery to Plaintiff the number or identity of any type of shares listed or described on said Schedule shall be altered, then the provisions hereof shall apply to any other shares attributable to the respective shares described and listed on said Schedule. The value of any shares which may split or upon which a stock dividend may be paid shall be present 'per share value' adjusted to account for such change, and the value of each share which may be issued in lieu of any present share or share shall be the average between the market high and low thereof from January 1, 1966 to May 21, 1966. . . ."

The schedule attached to the agreement listed the number of shares of stock in various companies, including 19,408 shares of Sunshine Biscuits, Inc. owned by the defendant outright, and 12,073 shares of Sunshine Biscuits, Inc. held in trust for him. The schedule also listed the "agreed per share value" for each type of stock. As previously noted, on May 27, 1966, a sizeable part of defendant's stock portfolio was held in trust by The First National Bank and defendant did not become entitled to those shares until after his fortieth birthday on July 29, 1966.

On the same date the settlement agreement was executed—May 27, 1966—the stockholders of Sunshine Biscuits, Inc. approved a merger of said corporation into American Tobacco Company effective May 31, 1966. Under the terms of the merger proposal 1.4 shares of American Tobacco Company stock were issued in exchange for each share of Sunshine Biscuits, Inc. stock. As a result,

in June 1966 defendant received a total of 44,072 shares of American Tobacco Company stock in exchange for the 31,481 shares of Sunshine Biscuits, Inc. stock owned by him or held in trust for his benefit.

The negotiations on the settlement agreement extended from early March 1966 until the date of its execution, during which time each party was represented by capable and experienced counsel. Defendant first learned of the proposed merger in January or February of 1966, when he read about it in the newspaper. He subsequently discussed the matter with one of his attorneys. The plaintiff also had knowledge of the proposed merger and mentioned it to her attorneys. In fact, on April 29, 1966, an official announcement of the proposal was sent to all Sunshine Biscuits, Inc. stockholders, which would include the plaintiff—she being the owner of some Sunshine Biscuits, Inc. stock in her own right. Despite the knowledge of the parties and their attorneys, the record fails to disclose the matter was discussed when the settlement agreement was executed.

When the time came to distribute the stock, defendant decided to exercise option (b) under the agreement, which provided for delivery to plaintiff of one-half of each type of stock listed on the schedule plus sufficient shares of Sunshine Biscuits stock to make up a total aggregate value of $550,000, using the "agreed per share value" as set forth in the schedule for determining the number of shares required. In the meantime the Sunshine Biscuits stock had been replaced with American Tobacco stock; therefore, defendant delivered to plaintiff one-half of each type of stock listed on the schedule plus 11,750 shares of American Tobacco stock (valued at $36.50 per share—the average market price from January 1, 1966, to May 21, 1966) to make a total aggregate value of $549,997.85. Plaintiff acknowledged receiving the stock but contended in her motion before the district court that under paragraph 6 of the settlement agreement she was entitled to 816 additional shares of American Tobacco stock. The district court upheld plaintiff's contention and ordered defendant to deliver to her the additional shares and pay any dividends thereon received by him since May 27, 1966.

Defendant has appealed from this portion of the district court's order, contending he has fully complied with the terms of the agreement. His argument, in substance, is that the agreement contemplates the total aggregate value of shares to be delivered to plaintiff

was $550,000, and that the fourth and fifth sentences of paragraph 6 specifically covered this situation, by providing that in the event of merger, or if the number or identity of any type of shares shall be altered, the provisions of the agreement shall apply to any other shares attributable to those listed on the schedule, and further, by providing the method of determining the value of any new shares issued in lieu of any present shares.

Plaintiff, on the other hand, seeks to uphold the district court's order by the argument that the "pegged value" of Sunshine Biscuits stock as provided in the agreement was $47.75 per share, that the figure of $550,000 was a "fictitious" or "artificial" value intended by the parties to determine the number of shares of stock to be delivered, that as of May 27, 1966, one-half of the value of stocks other than Sunshine Biscuits amounted to $121,405, leaving $428,-595 worth of Sunshine Biscuits stock to be delivered, that using the "pegged value" of $47.75 per share, defendant would have been required to deliver 8,975.8 shares of Sunshine Biscuits, that as the result of the merger each Sunshine Biscuits share was exchanged for 1.4 shares of American Tobacco stock, and the American Tobacco stock being "attributable" to the Sunshine Biscuits stock by the terms of the agreement, she was therefore entitled to a total of 12,566 shares instead of the 11,750 shares actually delivered to her.

There appears to be no dispute that the high-low average of American Tobacco stock for the period from January 1, 1966, to May 21, 1966, was $36.50 per share. By applying the $36.50 "per share value" to the additional 816 shares of American Tobacco stock claimed by plaintiff, defendant makes the point that under plaintiff's theory she would be receiving $29,784 more in stock than the $550,000 total aggregate value provided for in the agreement.

A cardinal rule in the construction of contracts is that they must be interpreted in light of their own peculiar provisions, and every provision must be construed, if possible, so as to be consistent with every other provision and to give effect to all. (*Brack v. McDowell*, 182 Kan. 368, 320 P. 2d 1056.) If a contract is clear and unambiguous, the terms thereof must be construed in such manner as to give effect to the intention of the parties at the time they entered into the contract, and this must be determined from the four corners of the instrument itself. (*Kittel v. Krause*, 185 Kan. 681, 347 P. 2d 269.)

We are unable to subscribe to plaintiff's interpretation of paragraph 6 of the agreement. To do so would ignore the first and

third sentences of said paragraph, which clearly limit the total aggregate value of stock to be delivered to plaintiff to $550,000. Furthermore, under plaintiff's interpretation that she is entitled to any shares attributable to the shares listed on the schedule (fourth sentence), the other portions of the paragraph are disregarded, particularly the fifth sentence. The fourth sentence expressly states the provisions of the paragraph shall apply to any other shares attributable to those described. This court has often said the intent and purpose of a contract cannot be determined by considering an isolated sentence, but by considering and construing the instrument in its entirety. (*Zelinkoff v. Johnson,* 185 Kan. 489, 345 P. 2d 665; *First National Bank of Lawrence v. Methodist Home for the Aged,* 181 Kan. 100, 309 P. 2d 389.)

Plaintiff argues the fifth sentence is useless and confusing, and we agree, were the agreement construed as plaintiff requests. If, as she suggests, she is entitled to any shares attributable to those listed on the schedule, there would be no need to assign a value to them in order to determine the number of shares to be delivered. The fifth sentence would have no purpose. On the other hand, if she is entitled only to stocks having an aggregate total value of $550,000, then the fifth sentence becomes most significant and meaningful. We cannot assume the sentence was inserted without good reason. We regard its use as being in contemplation of the very situation that developed, and was intended to apply where any of the listed shares were "altered" and new shares were issued in lieu of any present shares. Defendant's interpretation of paragraph 6 gives effect to each of the provisions in the paragraph, and we deem it the proper construction to be made.

Plaintiff makes the further argument that the doctrine of equitable estoppel which is designed "to prevent those who overreach from reaping benefits to which they are not entitled, and to secure to the deserving, the promotion of justice," should be applied in this case. We have examined the numerous decisions cited by plaintiff in support of her argument, but we are unable to say that defendant's conduct was such as to establish the necessary elements for application of the doctrine. (See, *Pelischek v. Voshell,* 181 Kan. 712, 313 P. 2d 1105.)

We hold that defendant has fully complied with paragraph 6 of the settlement agreement, and that the district court erred in order-

ing him to deliver to plaintiff 816 additional shares of American Tobacco stock and the accrued dividends thereon.

Plaintiff's cross-appeal relates to the matter of the assignment to her of life insurance policies on defendant's life. Paragraph 9 of the settlement agreement provides in part:

"The Defendant shall pay to Plaintiff for the support and maintenance of each of said minor children the sum of $2,500.00 per year until each such child becomes twenty-one years of age or sooner dies . . . *To secure the child support payments* to be made under this paragraph the Defendant will assign to Plaintiff the insurance policies on his life described and listed on Schedule 5 attached hereto . . . The Defendant agrees . . . to maintain said policies in force to the extent necessary to always provide sufficient funds *upon his death* for the payment of all of the child support thereafter to be paid by him hereunder." (Emphasis added.)

Schedule 5 listed four insurance policies with a face amount of $150,000 and cash value of $76,379.25.

In her motion to the district court plaintiff alleged defendant had failed and refused to assign the insurance policies as required by paragraph 9 of the agreement. At the hearing on the motion testimony was given by a life insurance underwriter affiliated with Massachusetts Mutual Life Insurance Company, the insurer on two of the policies, that the two policies with his company alone would be sufficient to guarantee payment of all future child support for the parties' four children " even if Mr. Wiles were to die immediately." His company, however, would not recognize an assignment of policies "conditioned" upon payment of child support. The underwriter suggested the same thing could be accomplished by means of a trust which would refer to the terms of the agreement. The defendant then offered in evidence a proposed trust agreement executed by defendant as "grantor" and The First National Bank of Kansas City as "trustee." The instrument provided that the grantor had deposited the four life insurance policies with the trustee, that grantor had arranged for the trustee to be designated as the beneficiary of all policies, that the trustee would receive all funds payable to it upon grantor's death under such policies, and that the trustee would hold and invest the trust estate and pay out of income and principal all of the payments accruing after grantor's death which were required to be made by the grantor under paragraph 9 of the agreement. The trust agreement further provided when all sums required to be paid by grantor under paragraph 9 had been paid, the trust would terminate. If at the time of termina-

tion the grantor was alive, then the policies would be delivered to the grantor and beneficiaries changed as he might direct. But if the grantor was dead at the termination of the trust, the remaining trust estate would be distributed as directed in grantor's last will and testament; or if there was no will, or direction in a will, then to his then living descendants *per stirpes*. The grantor relinquished his right to assign any of the policies or change the beneficiaries therein until the trust terminated.

The district court found that under the terms of the settlement agreement plaintiff was entitled to assignment of the four insurance policies *in trust* to secure payment of child support. To effectuate the assignment, the court ordered both plaintiff and defendant to accept and execute the proposed trust agreement and to comply with its terms.

Plaintiff now complains of the district court's order and contends she was entitled to an outright assignment of the policies under the provisions of the settlement agreement, and that assignment of the policies was not tied specifically to child support but furnished a part of the total consideration for the entire agreement settling the property and alimony rights of the parties. We are unable to follow plaintiff's reasoning on this point.

Paragraph 9 of the settlement agreement deals exclusively with child support. If the paragraph is read in its entirety, we believe reference to the assignment of insurance policies was intended only for the purpose of providing security to plaintiff for the payment of future child support in the event of defendant's untimely death. The last sentence of the paragraph requires defendant to maintain the policies in force to the extent necessary to provide funds *"upon his death* for the payment of all of the child support *thereafter* to be paid hereunder." (Emphasis added.) This would indicate the contingency intended to be guaranteed against was payment of child support if defendant died before his obligation to pay support under the terms of the agreement ceased. We are of the opinion that by the terms of the settlement agreement a trust arrangement was fairly contemplated whereby the insurance policies were to be used only as security for child support payments accruing after defendant's death. The proposed trust agreement, while not specifically provided for, may fairly be implied from the terms of the settlement agreement itself, so that the express purpose of the paragraph may be carried into effect. This court has said that provisions not specifically mentioned in a written con-

tract, but which are essential in carrying out its purposes, may be implied, and when properly implied are as binding as if written therein. (*Sykes v. Perry,* 162 Kan. 365, 176 P. 2d 579; *Zelleken v. Lynch,* 80 Kan. 746, 104 Pac. 563.) Although the district court had no authority to remake the contract, it was authorized to enforce the provisions of the one already made, including the rendering of an appropriate order which would carry out the purposes implied from the express terms of the written agreement. Accordingly, the court's order relating to the proposed trust agreement will not be disturbed.

In light of what has been said, the judgment of the district court is affirmed in part and reversed in part. The case is remanded to the lower court with directions to modify its order in accordance with the views expressed in the opinion.