463 P.2d 851

**Joan H. DEMAND, Appellant,**

**v.**

**Irene FOLEY, Administratrix w/w/a of the Last Will and Testament of J. N. Harber, deceased; and Transamerica Title Insurance Company, a corporation, Appellees.**

**No. I CA–CIV 811.**

Court of Appeals of Arizona,
Division 1.

Department A.

Jan. 19, 1970.

268

Kenneth S. Scoville and Leroy W. Hofmann, Phoenix, for appellant.

Lewis, Roca, Beauchamp & Linton, by Monroe G. McKay, Phoenix, for appellee Foley.

Evans, Kitchel & Jenckes, by Burton M. Apker, Phoenix, for appellee Transamerica Title Ins. Co.

DONOFRIO, Presiding Judge.

The facts framing the issues of this case are for the most part undisputed and began to take form in February 1962 when the defendant-appellant, Joan Demand, a Phoenix real estate broker, procured a buyer for approximately 2000 acres of land in the Cave Creek, Arizona area pursuant to a listing agreement with the seller wherein she was to receive a ten percent commission on the sale. Escrow instructions were signed on the 27th of that month by the buyer, Luke Land Corporation, and the seller, Dr. J. N. Harber. Phoenix Title & Trust Company acted as the escrow agent. The sales price was $1,000,000, of which the buyer paid $100,000 down on the close of escrow. As for the balance owing, the escrow instructions provided:

"Balance of $900,000 evidenced by trust agreement payable as follows: In annual installments of $90,000 or more, on or before the 31st day of December of every year, beginning December 31, 1963, together with interest on all unpaid principal * * *."

The instructions further provided for payment of Joan Demand's broker's commission "by separate agreement to Demand Realty". The separate agreement was en-

titled "Amendment to Escrow Instructions" and stated:

"It is agreed by and between the Broker and the Seller that the Seller owes the Broker a commission in the amount of $100,000 which shall be paid as follows:

"$10,000 payable at the close of this escrow. The balance of said commission, $90,000 shall be paid from the *deferred payments due Seller under this trust agreement, with the sum of $10,000 plus interest payable to said Broker from each annual installment received* by The Phoenix Title & Trust Company, as collection agent. The balance of said commission shall draw interest at the rate of 5% per annum, from December 31, 1962, payable in addition until total commission is paid in full." (Emphasis supplied)

"It is further agreed between the Seller and Broker herein that merely for the convenience of the Seller said commission is being paid from the deferred balance due under said Trust agreement.

"The assignment of the Seller funds to apply toward this commission shall be irrevocable and shall not be changed without the written consent of the Broker."

The trust agreement between Dr. Harber and Luke Land, hereinafter referred to as the Senior Trust, permitted Luke Land to have property released to it for certain stated release prices for sales to individuals or Junior Trusts. Phoenix Title & Trust Company was to act as the trustee and is one of the appellees in this case. The trial court has entered an order substituting the name of Transamerica Title Insurance Company for Phoenix Title & Trust Company as the new name of the corporation.

Dr. Harber died in August 1962, and in August 1963 his will was admitted to probate with Rex Staley and E. J. O'Malley appointed as co-executors. (In July 1969 Irene Foley was appointed Administratrix with the will annexed of Dr. Harber's estate and was substituted as appellee in place of the co-executors.)

Prior to December 31, 1963, the date when the first annual installment became due under the trust, Luke Land made two sales of part of the trust property to John Stewart and to Avenue Investment Company. On December 4, 1963 Luke Land sold another portion of the trust property to World Investment, Inc. under a separate trust agreement for $357,000.

From Luke Land's sales to John Stewart and Avenue Investment Company, lot release payments were turned over to Phoenix Title as trustee. On October 28, 1963 the trustee prepared and mailed to Demand Realty a check for $4,586.49 to apply toward the unpaid balance of the real estate commission. This check represented ten percent of the lot release monies in the hands of the trustee at that time. However, the trust officer subsequently stopped payment on the check, feeling that the escrow instructions were not clear as to whether Mrs. Demand was to receive money from the lot release payments toward her commission, or only a portion of the "annual installment".

When the December 1963 annual installment was not met by Luke Land, the executors of Dr. Harber's estate gave notice that they would institute forfeiture unless payment was forthcoming. Four months later the Title Company notified Luke Land of forfeiture. At this point, we note that even though the Senior Trust was "forfeited" insofar as Luke Land was concerned, the estate chose to continue the existence of the Senior Trust in order to collect and disburse the funds coming in from the sales by Luke Land.

On May 6, 1964 the executors brought suit against Luke Land, World Wide Investment (the Junior Trust), Phoenix Title & Trust Company and Joan Demand on several claims, none of which are pertinent to this appeal. Joan Demand counterclaimed against the estate and cross-claimed against the trustee, seeking the remainder of her commission. By the time of trial, the trustee held in excess of $120,000 of deferred land payments in the

trust, which were to be credited to the Harber account.

The trial court found against Mrs. Demand on her counterclaim and cross-claim. A motion for new trial was granted to allow further evidence of monies paid into the Senior Trust and thereafter judgment was again entered against Mrs. Demand. The appeal is from this judgment.

■■ We begin our discussion by noting that in Arizona the subsequent default by a buyer will not limit the broker's right to a commission without a specific contract to the contrary. Lockett v. Drake, 43 Ariz. 357, 31 P.2d 499 (1934); Briskman v. Del Monte Mortgage Company, 10 Ariz.App. 263, 458 P.2d 130 (1969). The broker has earned his commission on an open listing agreement once he has produced a buyer ready, willing, and able to purchase on the precise terms stipulated by the seller in his listing agreement. Bishop v. Norell, 88 Ariz. 148, 353 P.2d 1022 (1960). In the case at bar, the listing agreement is not in the record on appeal. However, the transcript reveals clearly that Mrs. Demand procured Luke Land as a buyer ready, willing, and able to meet the terms of the listing agreement some time before February 27, 1962, the date the escrow instructions were signed. Unlike Briskman, there is no evidence that the listing agreement contained any language which would cause Mrs. Demand to share in the risk of default by the buyer, Luke Land. This fact is further evidenced by the first paragraph of the Amendment to Escrow Instructions:

"It is agreed by and between the Broker and the Seller that the Seller owes the Broker a commission in the amount of $100,000 * * *."

However, Mrs. Demand's right to the immediate collection of her commission was altered by the Amendment to Escrow Instructions, and it is her rights under this document with which we are concerned.

The appellees' first contention is that Mrs. Demand is a creditor within the purview of A.R.S. § 14–570,[1] and having failed to present her claim to the executors, is forever barred from presenting *any* claim. We disagree.

We need not decide whether the Amendment to Escrow Instructions extinguished the debt between Dr. Harber and Mrs. Demand, for even if not extinguished, it would be barred under A.R.S. § 14–570 because of Mrs. Demand's failure as a contract creditor to timely present her claim. However, we do not believe her rights under the Amendment to Escrow Instructions are limited to those of a creditor.

As noted at the outset, the escrow instructions provided that the balance of $900,000 due Dr. Harber was to be paid under the terms of the Senior Trust. Although Dr. Harber was a beneficiary of the trust, it did not refer to Mrs. Demand. Her right to her commission was provided for in the Amendment to Escrow Instructions. Therein, it was agreed "by and between the Broker and the Seller that the Seller owes the Broker a commission in the amount of $100,000 * * *", and that the "assignment of the Seller funds. * * *" were to apply toward this commission. It is apparent that "the Seller funds" referred to in the Amendment to Escrow Instructions are funds due Dr. Harber under the terms of the Senior Trust.

"Both in England and in the United States today it is clear that the beneficiary of a trust, if he is not under a legal incapacity, can transfer his interest under the trust, unless his interest is made inalienable by the terms of the trust or by statute, or unless his interest is of such a character that it cannot be transferred, as, for example, where the

1. A.R.S. § 14–570: A. All claims arising upon contracts, whether due, not due or contingent, shall be presented to the executor or administrator within the time limited in the notice to creditors, and any claim not so presented is barred forever * * *.

trust is for his personal support, or is a discretionary trust. A beneficiary can transfer his interest either inter vivos or by will, either in whole or in part, either absolutely or as security or in trust." 2 Scott, The Law of Trusts § 132, 1072 (1967). See also, Restatement (Second) of Trusts § 132 (1959).

■ In the instant case none of the infirmities or restrictions referred to by Professor Scott are present. (There was a condition precedent to the right to assign, but that condition was met.) Consequently, Dr. Harber, as beneficiary of the Senior Trust, was at liberty to transfer to Mrs. Demand a part of his interest therein by assigning to her a portion of "the Seller funds". That he intended to do so is clear from the language of the Amendment to Escrow Instructions.

■ Because an assignee acquires an interest in the proceeds assigned, even though they may not yet be due, Valley National Bank of Arizona v. Byrne, 101 Ariz. 363, 419 P.2d 720 (1966), Mrs. Demand held a vested interest in part of the proceeds coming into the trust and could collect directly from the trustee without presenting this claim to the estate.

We must now decide what proceeds were assigned to Mrs. Demand. The appellees pose this argument:

(1) The following clause found in the Amendment to Escrow Instructions should be subject to the rule of construction "expressio unius est exclusio alterius":

"The balance of said commission, $90,000 shall be paid from the deferred payments due Seller under this trust agreement, with the sum of $10,000 plus interest payable to said Broker from each annual installment received by The Phoenix Title & Trust Company, as collection agent."

(2) By applying this rule of construction, the specific language "the sum of $10,000 plus interest payable to said Broker from each annual installment * * *" would control over the general language

"balance of said commission, $90,000 shall be paid from the deferred payments due Seller * * *."

(3) Therefore, Mrs. Demand was assigned a portion of "annual installments" only.

If the appellees' position prevailed, there would be no funds from which Mrs. Demand's claim could be satisfied because annual installments were never met. She could not have her claim satisfied from lot release monies coming into the trust, for the appellees deem the lot release monies to be synonymous with "deferred payments". The basic, but hidden premise, of appellees' argument is that "deferred payments" and "annual installments" constitute two separate funds under the Senior Trust, a premise which we believe presents a false dichotomy.

■ Webster defines the word "defer" as: to postpone, to put off deliberately to a future time. Webster's Third New International Dictionary (1965). Thus, under the ordinary use of the word, "deferred payments" would include any postponed or future payments coming into the trust which would reduce the outstanding balance due Dr. Harber. Since annual installments and lot release payments were to come into the trust subsequent to the signing of the trust instrument and the close of escrow, we can reach but one conclusion; i. e., "deferred payments" includes both annual installments and lot release payments.

This conclusion is further supported by the provisions of the Supplemental Escrow Instructions, wherein it was agreed that lot release payments were to apply on annual installments. Clearly, if lot release payments totaled $90,000 in any one year they would be *synonymous* with annual installments, a conclusion contra to that argued by the appellees.

The words in the Amendment to Escrow Instructions, "with the sum of $10,000 plus interest payable to said Broker from each annual installment" did no more than provide for a minimum annual payment of

$10,000 plus interest, which was "for the convenience of the seller", Dr. Harber.

■ One final point must be made. The intention or meaning in a contract may be manifested either expressly or impliedly, and it is fundamental that terms which are plainly or necessarily implied in the language of a contract are as much a part of it as those which are expressed. Zancanaro v. Cross, 85 Ariz. 394, 339 P.2d 746 (1959); Golder v. Crain, 7 Ariz.App. 207, 437 P.2d 959 (1968); Am.Jur.2d Contracts § 255 (1964). Here, when the Amendment to Escrow Instructions is viewed in light of the entire circumstances surrounding the transaction, its obvious import is that Mrs. Demand was to receive a ten percent share of any monies coming into the trust in any one year which were in excess of the $90,000 minimum annual installment. Were the construction urged by the appellees applied, Mrs. Demand would be entitled to only $10,000 plus interest in the event Luke Land satisfied its total obligation of $1,000,000 during the first year. We cannot believe that such a result was the arm's length agreement reached by Dr. Harber and Mrs. Demand.

Reversed for further proceedings not inconsistent with this opinion.

STEVENS and CAMERON, JJ., concur.