712 P.2d 511

Richard Dennis DAVIS, Gregory D. McKim, and C.R. McWilliams, Individually and d/b/a Magic Valley Radiology Associations, P.A., Plaintiffs-Counterdefendants-Respondents-Cross Appellants,

v.

PROFESSIONAL BUSINESS SERVICES, INC., a corporation, Defendant-Counterclaimant-Appellant-Cross Respondent,

and

Fred Kolouch, Defendant,

and

Helen Kolouch, both Individually and d/b/a Magic Valley Professional Center, and d/b/a Professional Answering Service, Defendant-Appellant

and

Margaret Kolouch, Defendant.

No. 15112.

Supreme Court of Idaho.

March 29, 1985.

Rehearing Granted June 18, 1985.

On Rehearing Dec. 16, 1985.

Lloyd J. Webb, of Webb, Burton, Carlson, Pederson & Paine, Twin Falls, for plaintiffs-counter defendants-respondents-cross appellants.

John Hepworth, of Hepworth, Nungester & Felton, Twin Falls, for defendant-counterclaimant-appellant-cross respondent.

BISTLINE, Justice.

## HISTORY

Plaintiffs-Respondents are Twin Falls radiologists and their professional association, Magic Valley Radiology Associates (plaintiff). ⁻Defendants-Appellants are Professional Business Services, Inc. (defendant) and Helen Kolouch, president of Professional Business Services.

In late 1976, plaintiff contracted with defendant to act as plaintiff's bookkeeper and accounts receivable service agent. The agreement called for plaintiff to pay defendant 15% of its gross receipts as they were deposited in plaintiff's bank account by defendant. The contract, never put in writing, was for a three-year period, ending March 1, 1980.

In the early part of 1980, plaintiff decided to change billing services. The change in billing services, however, would not occur before the end of the contract period; therefore, plaintiff told defendant it wished to continue on a month-to-month arrangement with 30-days notice of termination of services being given. Defendant agreed to this and continued to work for plaintiff.

Ultimately, plaintiff made arrangements with another accounts receivable service, Management Data Systems, (MDS) to begin work on July 1, 1980. On May 29,

1980, plaintiff notified defendant of the intended change. Defendant agreed to continue billing until July 1. Also on May 29, defendant informed plaintiff that it would be billed $12,000 for the work defendant had put into the generation of the "in process" billings and ledger cards which were a product of the generation. Defendant also charged plaintiff $1,058 for supplies already purchased. Questioning these charges, plaintiff refused to pay until they were explained.

On the next day, May 30, 1980, defendant reversed itself and notified plaintiff that it would no longer process any of plaintiff's accounts. On June 2, 1980, when plaintiff attempted to acquire the ledger cards and other records from defendant, Helen Kolouch, president of the company, refused to deliver them until plaintiff paid the money claimed on May 29. Plaintiff hired MDS in order to assimilate plaintiff's records immediately, instead of waiting until July 1, 1980, as originally contemplated. Plaintiff filed suit on June 6, 1980. The complaint was shortly amended. Plaintiff sought an injunction requiring the defendant to turn over "all mail, billing slips, check stubs, ledger cards, bank books and accounts receivable ledgers and all other books and records belonging to the plaintiffs." The action proceeded rapidly. On June 27, 1980, a hearing was held on the motion at which time and place defendant purported to deliver to plaintiff plaintiff's records.[1] However, plaintiffs filed a second amended complaint alleging in part:

Defendant further breached said Contract by refusing initially to turn over to plaintiffs any of the books and records in defendants' possession that would enable plaintiffs to continue billing their patients. Defendants did turn over to plaintiffs certain records on or about June 27, 1980, however, defendants did not then or at any later time release the individual ledger cards relating to plaintiffs' patients, and defendants' refusal to release said ledger cards to plaintiffs constituted a further breach of the parties' Contract.

## IX.

As a direct and proximate result of defendants' breach of Contract, plaintiffs were forced to incur start-up costs with their subsequent billing service in the amount of $14,090.10, which amount would not have been incurred had defendants released to plaintiffs the ledger cards and had defendants not breached the agreement by stopping work completely without notice at the end of May, 1980. As an additional proximate result of defendants' breach of Contract, plaintiffs have suffered lost profits in the amount of approximately $50,000.00, and

1. In the order entered after the hearing, the lower court stated:

It was stipulated that books, records and mail, all of the property of the Plaintiff in the possession of the appearing Defendants, were at that time delivered over to the Plaintiff, specifically including the following:

1) All charge tickets delivered to the appearing Defendants which had not been previously picked up by the Plaintiff;

2) All hospital daily logs in the possession of the appearing Defendants;

3) All bank statements at the Idaho First National Bank related to the business affairs of the Plaintiff upon which PEGGY KOLOUCH or any of the appearing Defendants were co-signatories;

4) All paid account records which had not been previously picked up by the Plaintiff;

5) All remittance advice records from insurance companies in the possession of the appearing Defendants;

6) All receipts and duplicate deposit books in the possession of the appearing Defendants;

7) All correspondence in the possession of the appearing Defendants which relates to the business of the Plaintiff and which had not been answered;

8) All records of work in process as of the termination of the services of the appearing Defendants on May 31, 1980;

9) All receipts, including checks and cash which have come into the possession of the appearing Defendants since their termination as bookkeepers and accounts receivable managers for the Plaintiff on May 31, 1980; and

10) Statement forms prepared by Moore Business Forms.

The Plaintiff acknowledges receipt of the specified records.

plaintiffs have incurred accounting fees of approximately $1,500.00.

R., pp. 124–25.

Defendant counterclaimed for commissions allegedly due for the work done on the "in process" accounts receivables. Defendant's counterclaim was dismissed prior to trial on a motion for summary judgment, the court concluding that defendant was an unlicensed collection agency in violation of I.C. § 26–2222 and was thus not entitled to recover on an illegal contract.

Plaintiff's claim was tried to the court without a jury. Plaintiff was awarded the amount of the reconstruction costs of $15,-870.10, plus prejudgment interest, and $24,-000 attorney's fees. Plaintiff's claim for lost profits was denied on the basis that plaintiff's proof did not establish that any such loss was attributable to defendant. The court observed that the ledger cards prepared by the defendants were a compilation of the financial history of each account, and reasoned that:

> They can only be said to belong to the accounts to which they apply and are only of use in the hands of those to whom the accounts are entrusted at any particular time.
>
> As of May 31, 1980, PBS [defendants] ceased servicing the MVRA [plaintiff] accounts; and that function was entrusted to MDS. As of that date the ledger cards on MVRA accounts were no longer entrusted to PBS; and MVRA had an absolute right to have those ledger cards relinquished into the possession of MDS.
>
> PBS, under the fiction that the cards, disassociated from the accounts to which they pertain and totally worthless in PBS's hands, were somehow the property of PBS, persisted in an irrational and groundless claim. This claim apparently had two.purposes. The immediate purpose appears to have been to serve as extortion to compel immediate payment of their contested, unenforceable claim for $13,058.52. The second purpose, and the one which worked, was to harass and delay the assimilation and operation of MVRA account handling by MDS.

This second purpose delayed MDS six weeks and caused extra expenses to MVRA in the amount of $15,870.10 as set forth above and in Exhibit 18.

. . . .

> The actions by PBS from May to December, 1980, were tortious relating to the unlawful detention of the ledger cards. The PBS by reason of the trust imposed in it prior to May 31, 1980, had an absolute duty to deliver MVRA's ledger cards to MVRA or PBS's successor. It flagrantly and tortiously violated its duty.

R., Vol. 8, pp. 324–25.

Defendant has appealed the dismissal of the counterclaim, and the judgment entered against it on plaintiff's claim. Plaintiff has appealed the district court's refusal to grant plaintiff damages for lost profits, and its failure to award punitive damages.

### I.A.

Defendant's first argument is that no legal basis exists upon which the district court could award plaintiff its costs associated with the reconstruction of its accounts. We are not persuaded. It is undisputed that defendant and plaintiff had entered into a contractual relationship of three years' duration and that at expiration it was extended by both parties upon a month-to-month basis. It is also undisputed that the parties never considered nor reached any agreement with respect to disposal of the ledger cards upon termination of the contractual relationship.

In every contract there exist not only the express promises set forth in the contract but all such implied provisions as are necessary to effectuate the intention of the parties, and as arise from the specific circumstances under which the contract was made. *Miller v. Independent School District No. 56 of Garfield County,* 609 P.2d 756, 758 (Okla.1980); *Wiles v. Wiles,* 202 Kan. 613, 452 P.2d 271, 278–79 (1969) ("[P]rovisions not specifically mentioned in a written contract, but which are essential in carrying out its purposes, may be implied, and, when properly implied, are as

binding as if written therein."). In implying terms to a contract that is silent on the particular matter in question, only *reasonable terms* should be implied. *State v. Fairbanks North Star Borough School Dist.*, 621 P.2d 1329, 1332 (Alaska 1981). Such implied terms are as much a part of the contract as those which are expressed. *Wiles, supra; Demand v. Foley*, 11 Ariz. App. 267, 463 P.2d 851, 856 (1970).

■ We are not persuaded that the district court's findings and conclusions were in error on this issue. The ledger cards not only were shown to be a work product of defendant which was occasioned by the contractual relationship of the parties, but a work product for which defendants had no use whatever after that relationship ended. That work product was essential to the furtherance of plaintiff's business. Defendant's refusal to release the ledger cards under these circumstances was certainly a breach of an implied term of the parties' contract that upon termination of the agreement the ledger cards would be turned over to the plaintiff. We are also not persuaded that the district court erred in finding that this breach of a contractual duty was flagrant in nature.

Defendant argues that it needed the ledger cards to verify the work it had done on the "in process" billings, intending to use the cards in pursuing its counterclaim for commissions allegedly due in connection with these billings. We fail to understand why simple xerox copies of the records would not have served defendant's purpose. For plaintiff, however, possession of the ledger cards was necessary for current billing. Delivery of the ledger cards would have avoided the reconstruction costs and time delay incurred by plaintiff and for which it was awarded damages. Delivery probably would have avoided plaintiff's lawsuit.

### B.

The district court's characterization of the type of harm for which defendant is responsible is unclear. Arguably, the court's holding can be viewed as saying that defendant's acts constitute a tort. We disagree with that conclusion.

The distinction between tortious conduct and a breach of contract merges on a foggy continuum, making identification of the nature of the harm caused sometimes difficult. But difficulty in correctly identifying the type of harm caused does not mean that harm did not occur. Defendant wrongfully withheld the ledger cards. We are satisfied that the facts of this case demonstrate a breach of an implied term of the parties' contract. Nor do we disagree with the district court's characterization of that contractual breach as flagrant in nature. ··

We encounter no problem as far as defendant PBS is concerned in characterizing the harm incurred by plaintiff, for it matters only in semantics whether the damages were based in contract for a breach of a contractual obligation to deliver the ledger cards, whether improperly motivated as the district court found, or for commission of a tort which was the flagrant and coercive conduct indulged in by defendant after the contract relationship terminated. This we say because we are unable to see from the record or find in the briefs where any contention is made that the district court's award of compensatory damages would have varied depending on whether based on tort or on contract.

■ As to the individual defendant, Helen Kolouch, however, the problem is not so easy. The trial court, in dealing with a motion to amend the judgment, specifically ruled that it ·was her tortious conduct which rendered defendant PBS liable:

### ADDENDUM TO MEMORANDUM CONSTITUTING FINDING OF FACTS AND CONCLUSIONS OF LAW

. . . .

From May through December, 1980, Helen Kolouch was the president of PBS. She initiated and continued the action of PBS in withholding ledger cards and other records of MVRA, and she did so in the course and scope of her employment

as president of that corporation. *Her actions constitute torts* against third persons rendering both the corporation and herself liable, and she cannot escape liability behind the shield of her representative character.

. . . .

Such judgment will be joint and several in form and shall run against the defendant corporation and Helen Kolouch, individually. The judgment by its terms shall bear prejudgment interest on $14,090.10 from November 24, 1980, and on $1,780.00 from September 29, 1981, as set by Idaho Code Section 28–22–104 as it existed prior to and after July 1, 1981. (Emphasis added.)

As mentioned above, it would seem that the court was then, if not earlier, of the view that the wrongful detention of the cards was a tort, rather than a breach of contractual obligations. But, at the same time as this ruling was made, the district court also held that plaintiff was entitled to prejudgment interest and awarded it—clearly smacking of a belief that the court found for plaintiff on a theory of contract liability.[2]

■ All things considered, we view the trial court's characterization of plaintiff's claim as one sounding in contract. Hence, judgment entered against Helen Kolouch, president of defendant, for the reconstruction costs must be reversed, for an officer of a corporation is not liable for a breach of a contract made in the corporation's name unless it can be shown that the "corporate veil should be pierced to avoid unjust consequences inconsistent with the corporation concept." *Barlow's, Inc. v. Bannock*

*Cleaning Corp.*, 103 Idaho 310, 315, 647 P.2d 766, 771 (Ct.App.1982); *See also, Paloukos v. Intermountain Chev. Co.*, 99 Idaho 740, 742, 588 P.2d 939 (1978). Here, there is no evidence to support piercing the corporate veil; thus, we adhere to the general rule stated above and reverse the district court's judgment entered against Helen Kolouch.

Plaintiff alternatively argues that Kolouch is liable for the reconstruction costs it incurred because her acts constituted a tortious interference of the contracts between plaintiff and its patients. We are not persuaded. Nothing in plaintiff's Second Amended Complaint alleges any such tort. Also, the only damages found at trial were those relating to the reconstruction costs of plaintiff's ledger accounts. These damages are in no way related to any injury suffered by plaintiff as a result of any alleged interference with contracts between plaintiff and its patients. Accordingly, no tort liability is assessable against Kolouch for her part in breaching the contract entered into by plaintiff and defendant.

## II.

■ Defendant next contends the court below erred in granting attorney's fees to plaintiff under I.R.C.P. 54(e)(1) and I.C. § 12–121. Where attorney's fees are awarded pursuant to I.C. § 12–121, a written finding is required setting out the basis and reasons for doing so.

Here the court stated only: "From all the facts presented in this case I find that this case was defended frivolously, unrea-

---

**2.** Generally, prejudgment interest is not awarded in tort cases. *See* Am.Jur.2d, Damages, § 189. There are exceptions to this rule, including when damages are reasonably certain in amount through reference to market values or by computation. Thus, many courts, including this Court, have awarded prejudgment interest in tort cases involving the tortious conversion of personal property. *See, e.g., Averill M. Co. v. Vollmer-Clearwater Co.*, 30 Idaho 587, 592, 166 P. 253, 254 (1917); *Commercial Standard Ins. Co. v. Remay*, 58 Idaho 302, 311–12, 72 P.2d 859, 863 (1937). Our research has not found where

this Court has in the past awarded prejudgment interest in a tort case outside of the area of conversion. Nevertheless, here the district court did award prejudgment interest. Since the district court presumably would hesitate to award prejudgment interest without precedent, it seems likely that the district court believed this to be an action founded on a contractual obligation rather than for tortious conduct. Unlike most personal property, the cards had no intrinsic value, and certainly no readily ascertainable market value.

sonably and without foundation." (R., at 325–26).

We are not persuaded that the record supports an award of attorney's fees. While it cannot be gainsaid that defendant violated its contractual duties by withholding the ledger cards, the judgment based upon that conduct was the only claim of four upon which plaintiff prevailed. Furthermore, the award was granted against only two of the six named defendants, one of which is by our decision absolved of liability. Manifestly, it cannot be said as a matter of law that the defendant should have paid the plaintiffs the amount of damages sought by the complaint, which was over $140,000. Because we also reverse the dismissal of defendant's counterclaim, *see* section III, *infra,* we vacate the award of attorney's fees, leaving that issue for reconsideration when there has been an entire disposition of the case following remand.

### III.

■ Defendant's third issue challenges the dismissal of its counterclaim against plaintiff because of the district court's conclusion that it was doing business without a statutorily required license.

The critical statutes are I.C. §§ 26–2222 and –2223, which govern the regulation of collection agencies and define a collection agency as an entity which "engages in any of the activities enumerated in § 26–2223." Section 26–2223 states in pertinent part:

No person shall without complying with the terms of this act and obtaining a permit from the director: (1) Conduct a collection agency, collection bureau or collection office in this state.

(2) Engage, either directly or indirectly in this state in the business of collecting or receiving payment for others of any account, bill, claim or other indebtedness.

. . . .

(5) Engage in any activity which indicates, directly or indirectly, that a third party may be involved in affecting any collections.

While servicing plaintiff's accounts, defendant sent out statements in plaintiff's name, received payments on plaintiff's account, and deposited those payments in accounts maintained exclusively in plaintiff's name. The district court held that such activities constituted being a collection agency. We disagree.

The language of I.C. § 26–2223 is extremely broad. Conceivably, it could be said to cover any person who receives payment, even in the name of the creditor, for another. This could potentially include a billing clerk, receptionist, secretary, or anyone else who participates in an accounts receivable processing activity, other than the creditor itself. We are unable to perceive that the legislature so intended.[3]

The Idaho Department of Finance filed an amicus brief. Therein it explains its view that the Act in question was designed to (1) protect the creditor whose money is collected by an assignee-collector who, absent the Act's protection, might not deliver the collected proceeds to the creditor; and (2) protect the public from unscrupulous collectors. Neither of these two purposes were here served by the district court's conclusion that defendant operated without the law.

We note that (1) defendant never sent any mailings or billings in its own name, but rather in plaintiff's name; (2) plaintiff never assigned any of its accounts to defendant; (3) defendant deposited all the money it received for plaintiff into plaintiff's own bank accounts; (4) plaintiff paid

---

3. *See Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892):

It is a familiar rule that a thing may be within the letter of the statute and yet not within its spirit nor within the intention of its makers .... This is not the substitution of the will of the legislator; for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act.

defendant directly from plaintiff's accounts upon signature of one of the plaintiff's personnel; and (5) when plaintiff's accounts were not paid in the regular billing process, defendant turned them over to a collection agency for collection. We reverse the judgment of the trial court dismissing the counterclaim and remand that claim for further proceedings.

## IV.

■ Defendant's fourth issue concerns the district court's awarding of prejudgment interest. Defendant argues, among other things,[4] that the award of prejudgment interest was improper because the damages involved in this case are unliquidated and are thus not awardable under the general rules involving the award of prejudgment interest. *See* 22 Am.Jur.2d Damages, §§ 180–81. In *Farm Development Corp. v. Hernandez*, 93 Idaho 918, 920, 478 P.2d 298, 300 (1970), we said: "It is ... settled that courts have refused to allow interest from a time prior to judgment when the principal amount of liability was unliquidated. This limitation is apparently based upon equitable considerations." Plaintiff agrees with this rule but argues that the damages here were mathematically and definitely ascertainable when incurred. If this is true, then prejudgment interest is awardable:

> "[W]here the amount of liability is liquidated or capable of ascertainment by mere mathematical process * * * this Court has allowed interest from a time prior to judgment, for in that event the interest in fully compensating the injured party predominates over other equitable considerations." *United States Fidelity & Guaranty Company v. Clover Creek Cattle Company*, 92 Idaho 889, 900, 452 P.2d 993, 1004 (1969); *Guyman v. Anderson*, 75 Idaho 294, 271 P.2d 1020 (1954). In order for interest to be computed from the date of the contract, the amount upon which the interest is to be

based must have been mathematically and definitely ascertainable.

> *Farm Development, supra,* at 920, 478 P.2d at 300.

■ In the case at bar we find plaintiff's damages to be "definitely ascertainable." The checks paid to MDS for reconstructing the plaintiff's accounts were all delivered no later than November 24, 1980. Therefore, in calculating plaintiff's damages resulting from the reconstruction of plaintiff's accounts, all the district court had to do was add up the amount of the checks. The allowance for prejudgment interest on this amount wrongfully incurred by plaintiff merely compensates them for the loss of the use of their money during the pendency of the action. Thus, we hold that the district court's award of prejudgment interest was proper and accordingly affirm as to this issue.

## V.A.

Plaintiffs allege that the district court erred by not awarding punitive damages. The court awarded attorney's fees and costs to the plaintiff under I.C. § 12–121, and obviously could not have made the same award as punitive damages. Plaintiffs' contention is that the facts of this case justified an award of punitive damages. Furthermore, plaintiff argues that the district court did not award punitive damages because the law in Idaho at the time the district court rendered its decision limited punitive damage awards in business disputes such as this case to awards of costs and attorney's fees. *See Jolley v. Puregro Corp.*, 94 Idaho 702, 710–11, 496 P.2d 939, 947–48 (1972); and *Cox v. Stolworthy*, 94 Idaho 683, 496 P.2d 682 (1972).

One week after the district court issued its decision, this Court in *Cheney v. Palos Verdes Investment Corp.*, 104 Idaho 897, 665 P.2d 661 (1983), concluded that *Cox* and *Jolley* had been found to be unworkable:

---

4. Defendant also argues that awards of prejudgment interest in tort cases are improper outside of conversion cases, and that since this case sounds in tort but is not one of conversion, any prejudgment interest award is improper. Because we view this case as one sounding in contract, defendant's arguments in this respect are not applicable.

We now hold that attempting to fit infinitely varied fact situations involving punitive damages into the overly simplified and restricted categories set forth in *Cox* has been demonstrated to be at best unworkable and at worst impossible. In both *Linscott* [*v. Rainier Nat'l Life Insurance Co.*, 100 Idaho 854, 606 P.2d, 958 (1980)], *supra*, and *Thompson v. Dalton*, [95 Idaho 785, 520 P.2d 240 (1974)], *supra*, we noted the possibility of "other similar situations in which aggravating and dire circumstances necessitate the departure from the general rule of exemplary damages in *Cox v. Stolworthy*." We now take the final step of overruling and discarding the *Cox* approach of forcing all fact situations into one of the three categories set forth in *Cox*.

We hold that punitive damage awards are in the first instance a jury decision, subject to the trial court's authority to modify or overturn that jury verdict as a matter of law.

104 Idaho at 903–04, 665 P.2d at 667–68. Specifically, we held in *Cheney* that the awarding of punitive damages is largely within the discretion of the trial judge. *Cheney, supra,* at 905, 665 P.2d at 669.

Here, the trial court spoke of the defendant's conduct in language clearly evidencing his belief that the defendant's conduct was of the outrageous type that this Court has traditionally recognized as meriting an award·of punitive damages. In *Cheney,* we stated:

> The justification for punitive damages must be that the defendant acted with an extremely harmful state of mind, whether that state of mind be termed "malice, oppression, fraud or gross negligence." *Cheney, supra,* at 905, 665 P.2d at 669 (citations omitted).

The Court thirty years ago recognized that punitive damages are recoverable for breach of contract where attended by "fraud, malice, oppression, or other sufficient reason." *Graves v. Cupic,* 75 Idaho 451, 272 P.2d 1020 (1954). The district court's failure to award punitive damages

may have been the constraints of *Cox* and *Jolley*. The question remaining, however, is whether the plaintiffs are entitled to the benefit of *Cheney*.

#### B.

Although courts have gone both ways in determining the effect of a change in law by judicial decision upon the disposition of a case then pending on appeal, the majority rule is that appellate courts should generally decide and dispose of the case in accordance with the law existing at the time of its own decision. 5B C.J.S. Appeal & Error, § 1841. And, where the trial court in its decision was then.bound by case law subsequently overruled, the appellate court should remand to allow the lower court to reconsider its decision in light of the new law. *Id.*

Idaho law is in agreement with these rules. In *Anderson v. Gailey*, 97 Idaho 813, 823, 555 P.2d 144, 154 (1976), the plaintiffs objected to the district court's decision not to give their requested instructions. The instructions had to do with amplifying upon the district court's definition of assumption of risk contained in other instructions submitted to the jury. This Court, per Justice Bakes, held that on retrial the district court should review its instructions concerning assumption of risk in light of a recent opinion by the Court on the principle involved. ·

We hold, similarly, that on remand the district court should review its decision concerning punitive damages in light of *Cheney*. In so ruling, we do not have or intimate any view as to the propriety of a punitive damage award.

#### VI.

Having considered all of the other errors alleged by both defendant and plaintiff, we find no error.

Affirmed in part, reversed in part, vacated in part, and remanded for further proceedings consistent with this opinion.

No attorney's fees on appeal. Each party to bear its own costs.

DONALDSON, C.J., and BAKES and HUNTLEY, JJ., concur.

SHEPARD, Justice, concurring in part and dissenting in part.

I concur in the result obtained by most of the majority opinion. However, I disagree with part 1B wherein defendant Kolouch's tortious conduct is transformed into conduct in breach of contract and hence insulated from liability because she was a corporate officer of PBS. The thrust of plaintiffs-cross-appellants' argument has not been answered, *i.e.*, Kolouch's acts constituted a tortious interference with the contractual relationship between the doctors and their patients.

I further disagree with the majority opinion, part IV, in its affirmation of the trial court's award of prejudgment interest. I do not view the record as demonstrating that the liability was clearly ascertainable and liquidated.

## ON REHEARING

BISTLINE, Justice.

A rehearing was granted on the following two issues: (1) whether Helen Kolouch should be found tortiously liable for the harm she caused; and (2) whether prejudgment interest was properly awarded. On both issues we continue to adhere to our original decision.[1]

With respect to the first issue, the plaintiffs argue first that Count Three of their Second Amended Complaint adequately alleges that Kolouch committed a tort against them, and, second, that this tort also involved the intentional interference of contractual relationships between the plaintiffs *and their patients.*

Plaintiffs cite to paragraph two of Count Three of their Second Amended Complaint to support their first argument. That

paragraph does state that the defendants did willfully commit the actions in question in order to harass the plaintiffs. It further states that such acts justify an award of punitive damages, and caused "severe strain in plaintiffs' relations with certain patients...." Paragraph three next states that such conduct also caused them to suffer severe emotional distress. Nevertheless, the complaint simply does not allege the elements of the tort they argue Kolouch committed, which we will discuss briefly. First, however, we note that it seems of little significance whether the tort was adequately alleged because we do not see that the requisite elements of such an alleged tort were proved.

*Barlow v. International Harvester Co.,* 95 Idaho 881, 893, 522 P.2d 1102, 1114 (1974), set down the elements which necessarily must be proved to sustain a claim of tortious interference with contractual relationships:

(a) the existence of a contract;

(b) knowledge of the contract on the part of the defendant;

(c) intentional interference *causing a breach of the contract*; and

(d) *injury to the plaintiff resulting from the breach.* (Emphasis added.)

In this case, the trial court held that there was no proof establishing any shortage of plaintiffs' accounts receivable. Thus, there is no evidence that Kolouch's actions allowed or caused any patient to breach the contractual obligation to pay the doctors. From that follows that there is no proof that the plaintiffs suffered any monetary loss resulting from a patient's nonpayment. The only damages found by the district court all related to the reconstruction costs plaintiffs incurred in reconstructing their billing records. Such damages are unrelated to a claim for damages which flowed from any nonpayment of medical bills, whether nonpayment was established or was not. Emotional distress resulting from severe strain in the doctor/patient

1. For further clarification, however, we have revised footnote 2 on page 516 of our original opinion.

relationship, even accepting that it was established, is not recoverable. *Brown v. Fritz*, 108 Idaho 357, 699 P.2d 1371 (1985).

With respect to the second issue, we are not persuaded to retreat from our earlier holding: damages here were "definitely ascertainable," and, therefore, entitled to the accrual of prejudgment interest.

DONALDSON, C.J., and BAKES and HUNTLEY, JJ., concur.

SHEPARD, J., continues to adhere to his views, concurring in part and dissenting in part, in the original opinion.