274

715 P.2d 944

**Roger SCRIMSHER, William Scrimsher, Martha Jones, and Nancy Freeman, Plaintiffs-Appellants,**

v.

**Leda SCRIMSHER, Defendant-Respondent.**

No. 15167.

Supreme Court of Idaho.

Jan. 31, 1986.

Rehearing Denied March 27, 1986.

Paul T. Clark, Lewiston, for plaintiffs-appellants.

Steven K. Ricks, Boise, for defendant-respondent.

SHEPARD, Justice.

This is an appeal from a decision of the trial court in favor of the defendant-respondent in an action by plaintiffs-appellants which in effect sought to impose a trust on certain real property, decree that defendant-respondent had only a life estate in said property, and require respondent to comply with the terms of an alleged oral agreement, and by will devise certain real property to appellants. We *affirm.*

Leda and Corey Scrimsher were married approximately 25 years prior to his death in 1971. Corey Scrimsher had been previously married and had four children of that first marriage. Those children are plaintiffs-appellants in the instant action.

The testimony of Leda Scrimsher reveals the following circumstances and events. At the time of his marriage to Leda, Corey Scrimsher owned a ranch in the Idaho Falls area. For approximately ten years Corey and Leda Scrimsher farmed that ranch and bought other very substantial parcels of ranch property which they also farmed. Following the marriage they purchased an implement dealership in Idaho Falls and a home in Idaho Falls. During all of that period of time there was a warm and loving relationship between the children and their father and stepmother. During part of those years the children would spend part

or substantially all of their time at the ranch with their father and stepmother.

In 1957, due to adverse economic conditions, Corey and Leda sold all of their properties in the Idaho Falls area and moved to the Culdesac area where they purchased four farm properties, the Davis, the Goodall, the Gray, and the Norberg (the home place). There, as at Idaho Falls, Leda Scrimsher participated actively in the ranching activities. At different times Leda and Corey Scrimsher attempted to give Roger, and then Bill, the Goodall place, but evidentally neither of them were sufficiently interested. In 1965 Corey Scrimsher suffered a heart attack and could not work the farms, so all the properties except the Norberg place were sold, along with their herd of cattle.

At some time during the 1960's, with all of the children raised and away from home, Leda Scrimsher, with the acquiescence of Corey, returned to college and began a career in teaching, ultimately becoming a college professor. Since the Norberg farm had been purchased on contract, Leda, along with her teaching career, participated actively not only in working the farm, but in paying off the indebtedness and making improvements thereto.

There is substantial evidence that the real property at issue here was the community property of Leda and Corey Scrimsher.[1] There is likewise no question but that Leda Scrimsher considered all of the four children to be her own children, as well as those of her husband, and that prior to this lawsuit she intended the four children to be her heirs. Corey Scrimsher shared the wish of Leda Scrimsher. However, at one time he evidently changed his mind and corresponded with his lawyer, directing the preparation of a will bequeathing all of the property to Leda Scrimsher. That will evidently was never executed. All of the above evidence was uncontradicted.

Following the death of Corey Scrimsher in 1971, Leda Scrimsher and the four children met at a lawyer's office. They were then informed that Corey Scrimsher had not executed a will but had in fact died intestate. Therefore, they were told that since the property in question, *i.e.*, the Norberg place, was community property, that it would pass to Leda Scrimsher. The testimony is somewhat conflicting regarding precisely what was then stated by the parties. All parties, however, were surprised at the non-existence of a will. Leda Scrimsher evidently believed that Corey had executed a will leaving everything to her, and the children evidently were surprised that Corey had not executed a will in some way bequeathing some interest in the Norberg property to them. In fact, the children thereafter went to the Norberg property and conducted a search for a will. No will was, nor has been, ever found.

It is asserted by the children that at the meeting following the death of Corey Scrimsher, Leda Scrimsher unequivocally agreed to execute an irrevocable will bequeathing the Norberg place to the children in return for their agreement not to contest the probate proceedings of their father's estate. On the other hand, Leda Scrimsher asserted that at said meeting she stated that the Norberg place was hers to do with as she wished, and if there was anything left at her death it would be bequeathed to the children.

The estate of Corey Scrimsher was probated. All of the property contained on the inventory was denominated as community property including the Norberg place. Distribution of the estate was made to Leda Scrimsher. Following the death of Corey Scrimsher, Leda Scrimsher made substantial improvements to the Norberg place and continued to make payments on the balance of the contract to purchase which was approximately $43,000.00. By then she was no longer living on the Norberg place, and

---

1. Even Roger Scrimsher testified:
   Q. "Mr. Scrimsher, you're not saying, are you, that your father ever treated his property here in Nez Perce County other than as community property?
   A. No, he didn't.
   Q. He always treated it as community property?
   A. That's right."

it was causing her very substantial economic problems, together with the problems of finding someone to work the land. She, at different times, offered to sell the place to two of the children, but they refused. There is no indication that any of the children performed any work or rendered any service on the Norberg place, or to Leda Scrimsher following the death of Corey Scrimsher. In 1981 she determined that the place was too much of an economic and personal burden upon her. Since none of the children desired to purchase it, she listed the property for sale. That action precipitated the instant lawsuit.

Trial was held and voluminous testimony of all the parties was taken. The testimony was substantially without conflict except that portion relating to the alleged oral agreement made by Leda Scrimsher immediately following the death of Corey Scrimsher. Following trial the court made extensive findings and conclusions which can be summarized as follows: the court found that the evidence as to the oral agreement of Leda Scrimsher was not shown by a preponderance of the evidence, to say nothing of the standard which requires clear and convincing evidence; that the evidence indicated a lack of reliance by the children on whatever agreement Leda Scrimsher may have made; that the exchange of letters between attorneys was not sufficient in specificity to satisfy the statute of frauds as a defense to an alleged oral agreement. The court concluded that the plaintiff children had not proven "the existence of any express contract, contract implied in fact nor quasi-contract, nor is this a case where the defendant should be equitably estopped. If any agreement did exist between the parties, its enforcement would be barred by the statute of frauds." The trial court held in favor of Leda Scrimsher and against all claims of the children, and the children appeal.

On appeal it is asserted that the trial court erred in ruling that the correspondence of the attorneys failed to satisfy the statute of frauds, in failing to enforce the alleged agreement under the doctrine of part performance, in failing to find that an agreement was entered into between the parties, and in failing to find that Leda Scrimsher was estopped to deny the existence of the agreement.

We note first that the trial court specifically found that the oral agreement, as contended for by the plaintiff children, *did not* exist. Hence, if that finding is sustained by the evidence presented at trial, we need not treat the question of whether that agreement was sufficiently evidenced by the writings of the attorneys, nor whether that alleged agreement was partially performed.

■ We view the evidence most favorably toward the respondent, and in support of the trial court's finding and decision. *Rueth v. State,* 103 Idaho 74, 644 P.2d 1333 (1982); *see also Fischer v. Fischer,* 92 Idaho 379, 443 P.2d 463 (1968). Under that standard the trial court may well have accepted the testimony of Leda Scrimsher and rejected the testimony of the children as to the conversations of the parties during and immediately following the meeting at the attorney's office following the death of Corey Scrimsher. The Scrimsher children assert that at said meeting Leda Scrimsher agreed to make an "irrevocable" will bequeathing the Norberg property to the children. That assertion is denied by Leda Scrimsher. She states that she agreed to make a will devising the Norberg property *if* anything of it was left at the time of her death. It is not disputed but that Leda Scrimsher did make a will naming the Scrimsher children as her heirs. However, upon the filing of the instant lawsuit that will was revoked by her. As noted by the trial judge, even considering the correspondence between the attorneys, nothing is mentioned concerning the irrevocability of such a will. Nor is anything mentioned concerning Leda Scrimsher holding only a life estate in the property. To that extent such correspondence is equivocal.

The trial court also held that the evidence revealed a lack of reliance by the Scrimsher children on any alleged promise

of Leda Scrimsher. Again, there is conflicting evidence between the testimony of the Scrimsher children and Leda Scrimsher concerning whether or not there was reliance by the children as shown by their later failure to actually engage in a contest of the Corey Scrimsher probate proceedings. According to the testimony of Leda Scrimsher, three of the children withdrew their participation in the proposed probate contest because of the friction and ill feelings it was causing in the family. The remaining son indicated that in any event he did not trust or believe whatever promise Leda Scrimsher may or may not have made.

█ The ruling of the trial court that Leda Scrimsher was not equitably estopped to deny her alleged agreement is, we hold, equally sustained by the evidence. The property in question was acquired nearly 30 years ago by Corey and Leda Scrimsher during the course of their marriage. It is undisputed that until Corey Scrimsher's death in 1971 he and Leda worked and paid for the farm, and made substantial improvements thereon. It is undisputed that for the ensuing ten years, 1971–1981, Leda Scrimsher worked and paid for the farm by herself.

There is no showing that the property was anything but the community property of Corey and Leda Scrimsher. There is nothing whatsoever in the record to indicate any attempt at tracing any separate property of Corey Scrimsher to indicate a separate property interest. Hence, there does not appear to have been any basis for the alleged or attempted contest to the probate of the estate of Corey Scrimsher.

As noted above, there is no evidence of any performance of work, or the rendition of any service, relating to the Norberg property, or for the benefit of Leda Scrimsher. In this respect the instant case is clearly distinguishable from cases such as *McMahon v. Auger*, 83 Idaho 27, 357 P.2d 374 (1960), wherein the claimant, under an asserted agreement to make a will, had spent many years in service to the decedent. We note further that the Court,

in *McMahon v. Auger, supra,* stated, "In the instant case there are no innocent heirs or next of kin who will be affected by the specific performance of the agreement involved." There were no other heirs, and the estate would otherwise escheat to the State of Idaho.

█ The settled rule in this state is "[w]here an oral agreement of this nature [to make a will] rests on parol evidence, it must be established by clear, satisfactory and convincing evidence. Such a contract is to be looked upon with suspicion and can only be sustained when established by the clearest and strongest evidence, and such evidence must be so clear and forcible as to leave no reasonable doubt of its terms or character." *Johnson v. Flatness,* 70 Idaho 37, 46, 211 P.2d 769, 774 (1949).

This rule was followed in *McMahon, supra,* wherein the Court stated, "that in order for an oral contract, such as is here involved, [to make a will] to be specifically enforced, it must be established by clear, convincing and satisfactory evidence and must be complete, definite and certain." *McMahon* also indicates that both the existence of such a contract and its terms, and the clearness and convincing force of the evidence thereof, "is a question primarily for the trial court" and will not be disturbed on appeal.

In short, we hold that the record supports the ruling of the trial court that an agreement to make an irrevocable will was not established by clear and convincing evidence. We further hold that the record supports the ruling of the trial court that the facts are not sufficient to equitably estop Leda Scrimsher from denying the existence of the alleged agreement as contended for by the Scrimsher children.

The decision of the trial court is affirmed. Costs to respondent.

DONALDSON, C.J., and BAKES, J., concur.

BAKES, Justice, concurring specially:

This is a very close case. However, recognizing that the plaintiffs in this case

must prove their case not merely by a preponderance of the evidence, but by "clear and convincing evidence," I concur in the majority opinion, believing that the trial court's decision should be affirmed.

The argument in the dissents is based primarily upon the letter (Exhibit # 8) from Mr. Jones, attorney for the plaintiffs, to Mr. Rapaich, attorney for the defendants, in which Mr. Jones states, "In reliance with your statement that your client, Mrs. Leda Scrimsher, *has made a will in conformance with her oral promise leaving the Culdesac property* to the four children of her late husband, Corey D. Scrimsher, including my client *and that she will supply us with a written statement that she shall leave the Culdesac property to these children,* my client in turn will not contest the appointment of Mrs. Scrimsher as administratrix, nor contest whether or not his father's will was legally cancelled prior to his death, nor contest whether or not the property of his father's estate is separate or community, nor make any other contest of the probate of his father's estate." (Emphasis added.)

Several of the conditions in that letter (Exhibit # 8) did not materialize. In the first place, the trial court found that there was no oral agreement. Secondly, Mrs. Scrimsher never did "supply us with a written statement that she shall leave the Culdesac property to these children...." Thirdly, the holographic will which she executed, but which was never provided to Mr. Jones or the plaintiffs, did not leave all of the property to the children as the plaintiffs alleged there was an oral agreement to do. Accordingly, on the face of Exhibit # 8, not all of the conditions which Mr. Jones imposed in his letter (Exhibit # 8) for an agreement to come into existence ever occurred.

On the issue of whether or not the children relied on any promise made by Leda Scrimsher in not proceeding with their probate contest, the trial court concluded that their decision to not proceed with the probate contest was not in reliance on any promise by Leda Scrimsher. There was testimony that three of the children withdrew their participation in the proposed probate contest because of the friction and ill feelings it was causing in the family. The primary mover in the proposed probate contest, Roger Scrimsher, testified on this issue that he did not trust or believe Leda Scrimsher's promise in the first place. One reasonable inference which the trial court could draw from that evidence is that the decision to drop the proposed probate contest was not in reliance upon any promise by Leda Scrimsher. It should now go without saying that it is the trial court which draws the inferences and makes the implications from the evidence, not this Court. In this case, where the burden of proof was on the plaintiffs by clear and convincing evidence rather than merely a preponderance, the inferences drawn by the trial court and the terms or lack of terms which the trial court implied from ambiguous language, were exclusively the province of the trial court and not this Court. Accordingly, while it is a close case, I believe the trial court's findings are sustained by the record in this case, and accordingly I join in the majority opinion.

HUNTLEY, Justice, dissenting.

The majority errs by confining its analysis to a discussion of whether there was an *oral* agreement between Mrs. Scrimsher and the Scrimsher children. As I perceive the issue, the question is not whether an *oral* agreement was reached by the parties, but rather whether a *written* agreement, independent of any oral conversation, existed and, further, whether there was partial performance. The majority has failed to incorporate several significant and, I believe, controlling facts in its statement of facts. Therefore, I will take this opportunity to set forth those facts which the majority omits.

After Mr. Scrimsher's death, his children were instructed by Leda Scrimsher's then attorney that decedent left no will and that Leda Scrimsher would likely receive all of the estate.

One of the children, Roger Scrimsher, retained attorney William J. Jones regarding the issues of whether his father left a will and whether the entire estate should properly pass to the stepmother as community property. The relationship between an attorney and client is one of agency. *Muncey v. Children's Home Finding and Aid Society of Lewiston*, 84 Idaho 147, 151, 369 P.2d 586, 588 (1962).

Mr. Jones subsequently entered into settlement discussions with Leda Scrimsher's attorney, Eli Rapaich. Correspondence was exchanged between Mr. Jones and Mr. Rapaich. Mr. Rapaich was authorized by Leda Scrimsher to act for her. Mr. Jones received a letter (Exhibit No. 6) from Mr. Rapaich confirming a telephone conference between the two attorneys. The letter stated, "This is to advise you that on December 20 I conferred with Mrs. Scrimsher telephonically concerning various proposals made by your client, Roger Scrimsher, concerning a settlement of the interests of the various heirs in the Corey Scrimsher estate. Mrs. Scrimsher informed me that she has drawn a will in conformity with her oral promises to the four children of Corey Scrimsher leaving the Culdesac Ranch property to these children. She advised that she recognizes that this was her husband's wish and she intends to fulfill the same." Mr. Jones responded in a letter (Exhibit No. 8) stating, "[i]n reliance with your statement that your client, Mrs. Leda Scrimsher has made a will in conformance with her oral promise leaving the Culdesac property to the four children of her late husband, Corey D. Scrimsher, including my client, and that she will supply us with a written statement that she shall leave the Culdesac property to these children, my client in turn will not contest the appointment of Mrs. Scrimsher as administratrix, nor contest whether or not his father's will was legally cancelled prior to his death, nor contest whether or not the property of his father's estate is separate or community, nor make any other contest of the probate of his father's estate."

Leda Scrimsher sent her attorney a copy of a holographic will which she had signed which left all but a portion of the property in question to plaintiffs. That will provided in part:

> The Culdesac Ranch property is to be divided among Corey's four children as per the following instructions: Since Corey and I gave approximately 24 acres to Roger in 1970 and he received Corey's diamond ring, his share will be an additional (10) ten acers [sic] to join his present property. The remaining crop land is to be equally divided among William T. Scrimsher, Martha S. Jones and Nancy S. Freeman. The timber and pasture lands, excluding those immediately around the buildings are to become William's. The house and buildings including the pasture paddocks around the buildings I am not including in the ranch package. Nor the Spring and water system that supplies the home. These will be a separate package. Any indebtedness against the ranch is to be assumed equally by the above named beneficiaries. (ex. Federal Land bank Loan.) (all back springs go to Bill.)

> The property described above is:
>
> SWNE 13–14: #2690 of SENE 24 35 3W
>
> 15–16 (exc. pt for highway):
>
> NESE 17–18: NWSE 19–20: SWSE 29–30 (exc #5862 therof [sic]).
>
> SESE 31–32
>
> NWSW—10 (exc NE Cor. 19 35 2W for highway)
>
> SWSW—11
>
> SESW—(exc NE cor. for highway.)

> It was Corey's desire to see his children share in the ranch at my demise.

In a codicil to the will, Mrs. Scrimsher wrote: "My will as you see is constructed in two parts. The first part leaves the ranch land to Corey's children as I said I would and as Corey would have wanted. The first part I shall not change." Only when and because Mrs. Scrimsher attempted to sell the property, did the children initiate the present suit. Mrs. Scrimsher then revoked that will.

At trial, Leda Scrimsher admitted that she received Exhibit No. 6 and accepted the terms thereof, that she agreed to make a will leaving the property in question to the Scrimsher children, that based upon the agreement the children dropped any action to contest the estate of their father, and that she later listed the property in question with a real estate agent with the intention of selling it. The children asserted that Leda Scrimsher had agreed to maintaining a life estate in the property, and that upon her death it would go to them in accord with her deceased husband's wishes. Leda Scrimsher testified that her *understanding* was that the property was hers to use as she saw fit and if, and only if, there was anything left at her death, it would go to the children.

The trial court in its Memorandum Opinion stated that:

> The evidence has not shown the existence of any express contract, contract implied in fact, nor quasi-contract, nor is this a case where the defendant should be equitably estopped. If any agreement did exist between the parties, its enforcement would be barred by the Statute of Frauds.
>
> In addition, ... the Court is aware of *no authority* which would provide the plaintiffs the relief they seek in their prayer. (Emphasis added.)

This appeal followed.

The question is whether the trial court correctly concluded, *as a matter of law,* that no contract or quasi-contract was shown by the evidence to exist in the present case. I believe that the trial court's legal conclusions were in error. The Memorandum Opinion setting forth the trial judge's findings of fact and conclusions of law not only misperceives the applicable law but misapplies the law to its factual findings, which factual findings present no problem whatever.

The majority states, "We note first that the trial court specifically found that the oral agreement, as contended for by the plaintiff children, *did not* exist. Hence, if that finding is sustained by the evidence

presented at trial, we need not treat the question of whether that agreement was sufficiently evidenced by the writings of the attorneys, nor whether that alleged agreement was partially performed." This misstatement of the issue does little more than serve the ends which the majority is determined to reach. When the writings and performance are looked at *apart from any oral conversation,* the writings and performance *in and of themselves* are sufficient to establish either a contract or reliance, or both.

A contract to bequeath or devise property is frequently presented to the courts for adjudication; and such a contract is held to be valid and enforceable if it possesses the necessary elements of a valid contract. *See Ohms v. Church of the Nazarene, Weiser, Idaho,* 64 Idaho 262, 268, 130 P.2d 679, 681–82 (1942); *Casady v. Scott,* 40 Idaho 137, 149, 237 P. 415, 418–19 (1924). Establishment of a contract to make a will or to pass property to heirs must be accomplished by clear and convincing evidence. *McMahon v. Auger,* 83 Idaho 27, 35, 357 P.2d 374, 378 (1960); *Anderson v. Whipple,* 71 Idaho 112, 126, 227 P.2d 351, 359 (1951). The rules for construing contracts to make wills or testaments are substantially the same as for construing other contracts. If the contract is in writing and is complete on its face, it will be assumed that no other terms had been agreed upon. If a contract is made up of two or more documents, they must be construed together. *See Ohms,* 64 Idaho at 269, 130 P.2d at 682.

First, I believe that the trial court improperly concluded that the Statute of Frauds would bar the enforcement of an agreement here if an agreement were otherwise found to exist. Promises to devise realty are within the clause of the Statute of Frauds which relates to sales of land. An agreement for sale of real property is invalid unless the agreement or memorandum thereof be in writing and subscribed by the party charged or his agent. *Hoffman v. S V Company, Inc.,* 102 Idaho 187, 190, 628 P.2d 218, 221 (1981). Assuming

the trial court found an agreement, exhibits 6 and 8, the letters exchanged by counsel for the parties, could satisfy this requirement. The written correspondence between counsel for Leda Scrimsher and counsel for Roger Scrimsher set forth the parties to the contract (Leda Scrimsher and Roger Scrimsher);[1] the subject matter thereof (a will to be drawn by Leda Scrimsher devising the Culdesac ranch property to the Scrimsher children); the price or consideration (conveyance of the property by will on the part of Leda Scrimsher; forbearance of suit against Corey Scrimsher's estate on the part of Roger Scrimsher); a description of the property (the Culdesac ranch property in Corey Scrimsher's estate) and all essential terms.

Leda Scrimsher contends that there was no consideration for her promise to convey the property by will. This argument is without merit. It is true that a mere promise to leave one's property to a certain person, unsupported by any consideration, is not enforceable. "[A] contract to make a will must be supported by a sufficient valid consideration, ... [and a] sufficient consideration may consist of a benefit to the promisor, or a detriment to the promisee, or both, ... [and] [i]t must have some value[,] ... but in the absence of fraud or overreaching, the promisor, if competent, can fix on anything not in itself unlawful as a consideration and *put his own value on it.*" (Emphasis added.) *McMahon,* 83 Idaho 38–39, 357 P.2d at 380 (1960) (quoting 94 C.J.S. *Wills* § 113(1) (1956)). Again, the majority, determined to reach its preordained destination remarks, "There is no showing that the property was anything but the community property of Corey and

Leda Scrimsher. There is nothing whatsoever in the record to indicate any attempt at tracing any separate property ... interest.... Hence, there does not appear to have been any basis for the alleged or attempted contest to the probate of the estate of Corey Scrimsher." However, forbearance of a lawsuit has been held to constitute sufficient consideration, *and the children need not prove that they would have prevailed in any action disputing Mrs. Scrimsher's claim to the property. Kundinger v. Kundinger,* 150 Mich. 630, 114 N.W. 408 (1908); *Hamilton v. Hamilton,* 154 Tex. 511, 280 S.W.2d 588, 594 (1955). In the Memorandum Opinion, the trial court noted:

Mr. Rapaich's letter of September 2, 1971 to Leda Scrimsher in which he indicated that he "advised Mr. Garry Jones that I thought the heirs were pursuing a very foolish policy in view of the fact that they *were being guaranteed the ranch at the time of your death if they didn't rock the boat*" cannot be regarded as a term of some written contract. (Emphasis added.)

However, the clear inference from Mr. Rapaich's letter to Mrs. Scrimsher is that even Mrs. Scrimsher's attorney believed that she had agreed to *"guarantee"* the property to the children if they did not pursue litigation. Repeatedly, the majority recites that the evidence as to what transpired during the *oral* discussion in the attorney's office is in conflict. What the majority blithely ignores, however, is that the *uncontroverted* evidence regarding the *written* exchange and the parties' understanding as to *its* import supports but a

---

1. Since the other Scrimsher children had not retained counsel in this matter, they were not parties to the agreement. However, since the agreement provided that the devise would be made to the Scrimsher children, it is clear that they were intended third party beneficiaries. A third person may enforce a contract made for his benefit though he did not know of the contract at the time it was made. *Jones v. Adams,* 67 Idaho 402, 408, 182 P.2d 963, 967 (1947).

"Where the vendor of land contracts to convey it for the benefit of a third party beneficiary, both the purchaser-promisee and the third

party beneficiary may compel specific performance." D. Dobbs *Handbook on the Law of Remedies,* § 12.10 at 852 (1973). The promisees of a contract to make a will need not wait until the death of the promisor, but may seek equitable relief against inter-vivos conveyances made by her in derogation of their rights. *Brown v. Superior Court in and for Los Angeles County,* 34 Cal.2d 559, 212 P.2d 878, 881 (1949). Hence, all four Scrimsher children were entitled to bring the instant action on the theory of contractual breach.

*single* conclusion—that Roger Scrimsher exchanged his right to contest the administration and proposed distribution of his father's estate for a specific devise from Leda Scrimsher. Hence, the agreement was supported by consideration.

Leda Scrimsher contends that the alleged agreement did not set forth all of the essential terms or conditions in that the children maintain that the will was to be irrevocable and that she was to retain a life estate in the property. Mrs. Scrimsher notes that the terms "life estate" and "irrevocable will" do not appear anywhere in the correspondence between counsel. Likewise, the trial judge in his Memorandum Opinion underscored the fact that nowhere in the written correspondence between counsel was reference made to the fact that Mrs. Scrimsher had agreed to write an *"irrevocable"* will. He also observed, "The defendant testified that she intended to make a Will leaving the 'Norberg' property to the four children; but, she never said she would make an *irrevocable* will." (Emphasis added.) The majority adopts this reasoning declaring that the correspondence is "equivocal" in that "nothing is mentioned concerning the irrevocability of such a will. Nor is anything mentioned concerning Leda Scrimsher holding only a life estate in the property." However, the fact that the term "irrevocable" was not specifically used to describe the will which Mrs. Scrimsher *admitted* she agreed to write, and which she, in fact, wrote, is not fatal to the childrens' claim. An agreement includes not only what is stated expressly, *but also that which of necessity is implied from its language. Commercial Insurance Co. v. Hartwell Excavating Co.,* 89 Idaho 531, 541, 407 P.2d 312, 317 (1965). *Wagner v. Wagner,* 58 A.D.2d 7, 395 N.Y.S.2d 641, 643 (1977) *(affd. Wagner v. Wagner,* 44 N.Y.2d 780, 406 N.Y.S.2d 38, 377 N.E.2d 482 (1978)) held that even though no restriction on disposition of property was expressly stated, the devisor was by implication restricted in her power to dispose of property which she had agreed to leave by will. Implied in Leda Scrimsher's promise to will the Culdesac

ranch property to the Scrimsher children was an agreement not to otherwise dispose of that property. "If a testator enters into a contract to devise or bequeath specific property, [her] conveyance of such property to a third person is a breach." W. Bowe and D. Parker, *Page on the Law of Wills,* § 10.23 at 491 (rev. treatise 1960). Moreover, if an offer is made and accepted, an undisclosed intention on the part of the offeror does not affect the contract. *Bolander v. Godsil,* 116 F.2d 437, 439 (9th Cir.1940). Leda Scrimsher's unexpressed opinion that she could dispose of the property or that the will was revocable does not impair the obligation assumed. "[A] mental reservation of a party to a bargain does not impair the obligation [she] purports to undertake." American Law Institute, *Restatement of the Law Second Contracts 2d,* § 17, Comment (c) (1981). The only *logical consequence* of the bargain struck between Leda and Roger Scrimsher would be that Leda Scrimsher would have a life estate in the property she had contracted to will to the Scrimsher children.

The trial judge, in his Memorandum Opinion, does not specifically state that he believed Mrs. Scrimsher and did not believe the Scrimsher children. Assuming that to be the case, however, the fact remains that Mrs. Scrimsher's testimony *did not contradict* the testimony of the Scrimsher children but instead *confirmed it.* "[A] board, court, or jury must accept as true the positive, uncontradicted testimony of a credible witness, unless his [or her] testimony is inherently improbable, or rendered so by facts and circumstances disclosed at the hearing or trial." *Farber v. State,* 107 Idaho 823, 824, 693 P.2d 469, 470 (Ct.App. 1984) (quoting *Pierstorff v. Gray's Auto Shop,* 58 Idaho 438, 447, 74 P.2d 171, 175 (1937)). In the instant case, the evidence as to the import of the *written* exchange was not in conflict nor could it be. Both parties testified to the exchange of letters between their attorneys. Leda Scrimsher admitted that she agreed to make a will leaving the Culdesac Ranch property to the Scrimsher children and that because of her promise,

Roger Scrimsher agreed not to contest the probate of his father's estate. Leda Scrimsher also admitted that she later listed the property in question with a real estate agent with the intention of selling it. Only one reasonable inference could be drawn from the uncontradicted evidence—for a specific devise Roger Scrimsher exchanged a forbearance of suit. The majority errs therefore in failing to reject Leda Scrimsher's various contentions in support of her claim that she was not a party to an enforceable *written* agreement. While one may deeply sympathize with Mrs. Scrimsher's economic difficulties and acknowledge her efforts toward improving and maintaining the property over the years, the law does not allow us to ignore the fact that, *by her own admission,* she agreed to leave the property to Mr. Scrimsher's children *if they agreed not to contest the administration of his estate.* Courts ought not rush headlong to rescue litigants attempting to avoid the consequences of bargains improvidently struck.

At a minimum, three of the Scrimsher children would be entitled to recover under the doctrine of promissory estoppel. Section 90 of the Restatement (Second) of Contracts sets forth the requirements for promissory estoppel:

§ 90 Promise Reasonably Inducing Action or Forbearance.

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

American Law Institute, *Restatement of the Law Second, Contracts 2d,* § 90 (1981).

The testimony is *undisputed* that Mrs. Scrimsher promised the Scrimsher children that she would write a will in accordance with the wishes of her late husband that the children receive the Culdesac property upon her death. This was a promise which she should reasonably have expected to induce forebearance on the part of the promisees. Her promise, in fact, induced forebearance on the part of William Scrimsher, Nancy Freeman and Martha Jones. In his Memorandum Opinion, the trial judge made the following findings relevant to the resolution of this issue:

According to the testimony of another plaintiff, William Scrimsher, he was in frequent contact with Roger concerning the will contest. Following a discussion with Martha and with his pastor, and *based upon the promise that had been made by Leda,* Bill decided not to contest the probate of his father's estate. William stated that *he did rely upon his step-mother's promise to make an irrevocable will.* William was in contact also with Martha, another plaintiff, who said that she would do what William decided to do.

Nancy Freeman, another plaintiff, testified as follows:

By that time, Bill and Martha had decided not to go through with it and we decided we would, at least, I did, *to take Leda's word for it* that this is what she would do and then I told Roger of my decision.

In its Memorandum Opinion, the trial court stated:

It is reasonable to infer from the evidence that three of the children simply decided *not to pursue their legal cause of action.* They decided instead *to rely upon the statements of Mrs. Scrimsher* to the effect that she would will the property to them.

Clearly and without contradiction, it was established that Mrs. Scrimsher promised to will the property to the children and that three of the children relied upon that promise. Injustice can only be avoided by enforcement of the promise.

In its Memorandum Opinion, the trial court stated:

[E]ven if the plaintiffs had carried their burden of proving that there was a legally binding agreement to make an irrevocable will, the Court is aware of no authority which would provide the plaintiffs the relief they seek in their prayer.

In some respects it appears that the trial court reasoned backwards from this foreordained result, that result resting on the misconception that the Scrimsher children had no remedy available to them. Ordinarily, the would-be purchaser under a land contract can obtain an equitable decree of specific performance, in which the court will order the vendor to convey the land according to the terms of the contract. The usual rule that equity will not act if the remedy at law is adequate has little place in these cases, since land is regarded as unique and if the purchaser wishes a particular parcel he contracted for, damages are regarded as an inadequate substitute. See D. Dobbs, *Handbook on the Law of Remedies*, § 12.10 at 847 (1975). However, where the land in question is not unique, damages may be an adequate remedy. *Watkins v. Paul*, 95 Idaho 499, 501, 511 P.2d 781, 783 (1973); *Suchan v. Rutherford*, 90 Idaho 288, 303, 410 P.2d 434, 443 (1966). In the instant case, the property in question is unique, having special value to the Scrimsher children because it had belonged to their father. Hence, their remedy at law is inadequate.

Idaho Constitution, Art. I, Sec. 18 provides that "[c]ourts of justice shall be open to every person, and a speedy remedy afforded for every injury of person, property or character...." 79 Am.Jur.2d, Wills, § 381 states, in part, "It is ... within the province of a court of equity which grants relief prior to the death of the promisor for breach of a contract, to devise property to impose such conditions for observance by the promisee as are equitable in the premises and in keeping with the requirements of conscience and righteous conduct." *White v. Massee*, 202 Iowa 1304, 211 N.W. 839, 842 (1927).

In the case at bar, Leda Scrimsher's admission that she had listed the property in question with a real estate agent with the intent to sell it is clear and convincing evidence that she intended to breach the contract. Where, as here, the promisor in her lifetime repudiates the contract and declares or manifests her intention not to be bound by it, equity may, on bill in the nature of *quia timet*, declare the property to be held in trust for the promisee, his enjoyment to begin according to the terms of the contract. *Richardson v. City Trust Co.*, 27 F.2d 35, 38 (7th Cir.1928); *See Remele v. Hamilton*, 78 Ariz. 45, 275 P.2d 403, 406 (1954); *Cf. Chantland v. Sherman*, 148 Iowa 352, 125 N.W. 871, 874 (1910) (conveyance ordered subject to life interest of promisor).

It is axiomatic that findings of fact made by the trier of fact will not be disturbed on appeal if they are supported by substantial competent, although conflicting evidence. I.R.C.P. 52(a); *Rueth v. State*, 103 Idaho 74, 77, 644 P.2d 1333, 1336 (1982). Here, the evidence was not in conflict, and I do not suggest that the Court disturb the trial court's findings of fact. However, in the present case the application of the law to the *trial court's factual findings* mandates a *legal conclusion* contrary to that reached by the trial court and rubberstamped by the majority. Roger Scrimsher fully performed his part of the contract. Leda Scrimsher by attempting to sell the property is in anticipatory breach of their agreement. Therefore I would hold that the Scrimsher children are entitled to a decree impressing a trust upon the real estate for their benefit.

BISTLINE, Justice, dissenting.

*Wolford v. Tankersley*, 107 Idaho 1062, 695 P.2d 1201 (1985) was an action pursued on the theory of an unjust enrichment to the buyers of real property who were alleged by the sellers and their agent (Wolford) to have at all times known that the sellers wanted and expected to receive in the transaction the sum of $17,500, their asking price. In the trial court there can be no doubting that that factual issue was resolved in favor of the sellers and their agent based on a letter written by the buyers' attorney. Other than for the letter, the testimony of the parties was at best in a state of equipoise. The trial court's Finding V tells it all:

Thereafter, the Tankersleys and Wolford had several meetings and conversa-

tions. Wolford has no recollection of telling either or both of the Tankersleys the asking price, but believes he did because he always does. Mrs. Tankersley concedes he may have told her the asking price. Mr. Tankersley testified neither he nor his wife in his presence were told the asking price.

Further, regarding their knowledge of the asking price, a *letter from their attorney* dated December 18, 1978, states:

He stated that they would need to see Wolford Real Estate Agency if they were interested in purchasing the property. At this time, no mention was made of what the seller's asking price was. The foregoing took place on a Sunday. Within the next day or two, Mr. and Mrs. Tankersley made an appointment to meet Mr. Wolford at his office in the evening. *They met with Mr. Wolford and at that time were told by Mr. Wolford that the Empeys were asking approximately $17,000.00* for this piece of property.

I *specifically* asked Mr. and Mrs. Tankersley if the asking price of $17,-000.00 was talked of again, and they replied that it had not been. *Id.* at 1088–89, 695 P.2d at 1227.

In this Court there also can be no doubting that this finding carried the day for the sellers and their agent:

The parties stipulated that the Empeys expected to receive $17,500 for the property, and Mr. Empey testified that he became aware of the lien but "didn't think it had anything to do with the fifteen thousand eighty-two." In concluding that the Tankersleys were unjustly enriched, the trial court stated that "[t]he Tankersleys passively accepted the real property, knowing that under the sales documents they would not have to pay $7,361.21 of the purchase price which the sellers expected to receive and which they, at the time they made their offer, expected to pay."

This Court has often stated that the trial court's findings of fact will not be set aside unless they are found to be clearly erroneous. I.R.C.P. 52(a); *Credit Bureau, Incorporated of Georgia v. Harrison,* 101 Idaho 554, 617 P.2d 858 (1980). This Court has also stated:

"The rules of civil procedure clearly indicate that regard is to be given to the special opportunity of the trial court to judge the credibility of witnesses who appear personally before it. I.R.C.P. 52(a). Where there exists sufficient evidence in the record to support the lower court's findings on credibility, this Court sitting without the firsthand observation necessary to evaluate witness credibility, will not set aside those findings."

*Id.* at 556, 617 P.2d at 860.

Concerning the finding that the Tankersleys knew the Empeys expected to receive $17,500, and that they initially intended to pay that amount when they made their offer, Mr. Wolford testified that he stated the purchase price to the Tankersleys, and Mrs. Tankersley testified that Mr. Wolford might have told her the purchase price. However, she also testified that she did not remember hearing the purchase price and her husband testified that he never asked, and was never told, the purchase price. *However, a letter, signed by the Tankersleys' attorney,* that was admitted into evidence, *stated that "[t]hey [Mr. and Mrs. Tankersley] met with Mr. Wolford and at that time were told by Mr. Wolford that the Empeys were asking approximately $17,000 for this piece of property."* The Tankersleys denied this part of the letter. Mr. Wolford also testified that Mrs. Tankersley represented the contract, which was being assigned to the Empeys, to be worth about $15,-000. *Id.* at 1065–66, 695 P.2d at 1204–05 (emphasis added).

The first set of opinions in *Wolford* were not released until May 22, 1984. Judge Schilling wrote his decision in *Scrimsher* on June 23, 1983, and was of course without the benefit of the Court's opinion in *Wolford.* There is no doubt in my mind that had Judge Schilling had *Wolford* available, it would have changed his entire view

**286**

of the case and the tenor of his reasoning. Additionally, it seems quite clear that Judge Schilling erred in making a decision which involved I.C. § 9–503, R., p. 48. That section deals entirely and only with transfers of real estate, which are required to be in writing.

Try as I might, I am unable to see how the section has any applicability to this controversy. The preceding section, I.C. § 9–502, requires that wills other than noncupative must be in writing to be valid, but also allows for secondary evidence of its contents where the will cannot be shown. Obviously, § 9–502 here has no application, because it is conceded that Leda Scrimsher *did* execute a will in favor of her deceased husband's children.

Moreover, I.C. § 9–504 seemingly recognizes that wills, insofar as they contain provisions for devising real property which will become effective on death—and hence are not *presently* effective conveyances— are not within the prohibition of § 9–503. More importantly, § 9–504, which was the backbone of *McMahon v. Auger,* 83 Idaho 27, 357 P.2d 374 (1960), provides that § 9–503 "must not be construed ... to abridge the power of any court to compel the specific performance of an agreement, in case of part performance thereof." Many are the Idaho decisions which have applied the principle that statutes of fraud—indispensable evidence, Chapter 5 of Title 9, will not be used as instrumentalities of fraud. In 1971, the Court had before it an agreement involving real property which agreement was entirely oral and with no evidence of any written memorandum:

> We find the district court correct in concluding that the oral contract between the parties to convey real estate was enforceable and in decreeing that appellants specifically perform by conveying fee title to The Corporation. The Idaho statute of frauds, I.C. § 9–503, requires a transfer of real property to be in writing. However, the statute does not apply when specific performance is sought and there has been partial or complete performance. I.C. § 9–504;

*Tew v. Manwaring,* 94 Idaho 50, 480 P.2d 896 (1971); *Quayle v. Mackert,* 92 Idaho 563, 447 P.2d 679 (1968); *McMahon v. Auger,* 83 Idaho 27, 357 P.2d 374 (1960); *Anselmo v. Beardmore,* 70 Idaho 392, 219 P.2d 946 (1950). In the case before us practically all the individual terms of the original contract and the accord and satisfaction had been performed except the delivery of the deed. Though the agreement to transfer the real estate was oral, the district court properly decreed specific performance. *Brown v. Burnside,* 94 Idaho 363, 365, 487 P.2d 957, 959 (1971).

It is impossible to distinguish that case from this. Here, it is undisputed that the plaintiffs forebore taking any legal action against Leda Scrimsher at the time the estate of Corey Scrimsher was being probated, and having given up that right, could not later assert it. (How they would have fared is of absolutely no consequence. That is something which always lingers in the minds of those who avoid litigation by settling.) In turn, Leda Scrimsher did make a will in their favor. Judge Schilling recognized this:

> By holographic Will dated November 26, 1971, and signed by Leda S. Scrimsher on January 10, 1972, the defendant purported to devise the "Norberg" property among the four children excepting therefrom the house and buildings including the pasture, the spring and water system that supplies the home which she left to a church.

> Following the initiation of the present law suit, the defendant, Leda S. Scrimsher Hall revoked that Will. R., p. 47.

Left wondering why Judge Schilling spoke in terms of a "purported devise," it is clear that he understood that she had in fact signed her own holographic will.

Unlike *Brown,* but presenting an even much stronger case, here Judge Schilling first eases our review effort by finding that Leda Scrimsher "testified that she intended to make a will leaving the 'Norberg' property to the four children...." This

was when the four children and Leda Scrimsher were all present at the law offices of Eli Rapaich—to which all had together repaired "for the purpose of reading Corey's will." As Judge Schilling explained:

> The plaintiffs believed that a will was in existence leaving a portion of the real property owned by Corey and Leda to the plaintiffs. The plaintiffs believed this because their father had told them that he had prepared a will. They also knew that a will had been prepared for Corey Scrimsher by Eli Rapaich in 1964 prior to a trip outside the country by Corey. The defendant also believed that a will had been prepared.
>
> All of the parties were surprised when Mr. Rapaich informed them that the will of 1964 had been revoked by Corey Scrimsher and there was in fact no will in existence. R., p. 42.

Judge Schilling having remarked on Leda Scrimsher's then stated intention of making a will in the plaintiffs' favor, added, "but, she never said she would make an irrevocable Will." R., p. 43. Judge Schilling went on in the findings portion of his written decision:

> The parties then left Mr. Rapaich's office and a discussion took place in the Payless Drug Store Parking Lot in Lewiston, Idaho. Indications are that at that time the plaintiffs again expressed the belief that the decedent had left a Will. Nancy Freeman testified that at the time Leda again stated that she would prepare an irrevocable Will leaving the "Norberg" property to the plaintiffs upon her death. R., p. 43.

With that background, there followed the exchange of letters by the attorneys which was far, far more than the evidence of the agreement which could be produced in *Brown*—and which brings into play the relevance of *Wolford*. Plaintiffs' attorney received the following letter from Leda Scrimsher's attorney, under date of December 21, 1971:

> This letter is written to confirm our various phone and/or office conferences concerning the above estate.

This is to advise you that on December 20 I conferred with Mrs. Scrimsher telephonically concerning various proposals made by your client, Roger Scrimsher, concerning a settlement of the interests of the various heirs in the Corey Scrimsher estate. *Mrs. Scrimsher informed me that she has drawn a will in conformity with her oral promises to the four children* of Corey Scrimsher, *leaving the Culdesac ranch property to these children.* She advised ·that she recognizes that this was her husband's wish and she intends to fulfill the same. Mrs. Scrimsher is perfectly willing to supply you with a written statement that she will leave the Culdesac property to the Scrimsher children.

She further advises that three of the children have told her that they are perfectly satisfied with the assurances that she has made them, and that the only child who appears to be objecting in any way is Roger Scrimsher. Plaintiff's Ex. 6 (emphasis added).

Responsive thereto, plaintiffs' attorney wrote back two days later:

> I have consulted with my client Roger Scrimsher regarding your letter of December 21, 1971 on the above estate. *In reliance with your statement that your client, Mrs. Leda Scrimsher has made a will in conformance with her oral promise leaving the Culdesac property to the four children* of her late husband, Corey D. Scrimsher, including my client, and that she will supply us with a written statement that she shall leave the Culdesac property to these children, *my client in turn, will not contest the appointment of Mrs. Scrimsher as administratrix, nor contest whether or not his father's will was legally cancelled prior to his death, nor contest whether or not the property of his father's estate is separate or community, nor make any other contest of the probate of his father's estate.*

At your earliest convenience I would appreciate receiving the written statement of Mrs. Scrimsher as set forth in your

letter. Plaintiff's Ex. 8 (emphasis added).

The two letters easily supplied a written memorandum of the understanding of the parties if such were thought to be needed. The written statement, if given, would have been superfluous—especially where ten years later Leda Scrimsher would be heard to say that she had never made promises that she would not revoke the will which was executed in compliance with the settlement.

The pivotal statement in Judge Schilling's decision would seem to be found in his observation that "she [Leda Scrimsher] never said she would make an irrevocable will." On first perusal of the record, this was accepted as being the judge's recitation of the trial testimony of Leda Scrimsher. Later arose the thought that it was merely his own observation offered in support of his conclusion that she could not be held accountable unless she had uttered some language that bound her to the proposition that the will was not subject to being revoked. To my mind it is irrelevant whether she so testified, or the judge was simply observing.[1] If the 1971 conversations at the lawyer's office, and outside, and the exchange of the two letters were all participated in by Leda Scrimsher with the secret mental reservation that she retained the option to upset the arrangement—in fact nullify it, by sometime later revoking the will which she had drawn, there was an impermissible breach of the agreement, or an estoppel, or both. In *Cheney v. Jemmett*, 107 Idaho 829, 693 P.2d 1031 (1984), the Court, Justice Bakes alone dissenting, recognized the requirement that a party act fairly and in good faith. Shortly after, the Court in *Davis v. Professional Business Services*, 109 Idaho 810, 712 P.2d 511, 514 (1985), said in a similar vein:

In every contract there exist not only the express promises set forth in the contract but all such implied provisions as are necessary to effectuate the intention of the parties, and as arise from the specific circumstances under which the contract was made. *Miller v. Independent School District No. 56 of Garfield County*, 609 P.2d 756, 758 (Okla.1980); *Wiles v. Wiles* [202 Kan. 613], 452 P.2d 271, 178–79 (Kan.1969) ("[P]rovisions not specifically mentioned in a written contract, but which are essential in carrying out its purposes, may be implied, and, when properly implied, are as binding as if written therein."). In implying terms to a contract that is silent on the particular matter in question, only **reasonable terms** should be implied. *State v. Fairbanks North Star Borough School Dist.*, 621 P.2d 1329, 1332 (Alaska (1981). Such implied terms are as much a part of the contract as those which are expressed. *Wiles, supra; Demand v. Foley* [11 Ariz.App. 267], 463 P.2d 851, 856 (Ariz. Ct.App.1970). *Davis, supra* (Underscoring emphasis added, bold emphasis original).

Over forty years ago in *Ohms v. Church of the Nazarene*, 64 Idaho 262, 130 P.2d 679 (1942), cited in Justice Huntley's opinion, Justice Ailshie, Idaho's most outstanding jurist of all time, used similar language in denouncing the breaching of a contract to devise realty by the expediency of disposing of it:

[G]ood faith on the part of such surviving spouse forbids the survivor giving away a substantial part of the estate as to defeat the chief purpose of the residuary bequest. [Citations omitted.] The latter is just what has been done in this case. In such case, it is unnecessary to prove *actual* or *intentional fraud*. The fraud will rather be determined "by the facts and circumstances under which the

---

1. The actual testimony of Mrs. Scrimsher on this point reads as follows:

Q. There has been testimony that you said I'll make an irrevocable will or irrevocable will it's been pronounced; did you make a statement like that?

A. No, I didn't. It was just a will. R., Vol. 2, p. 211.

It is readily seen that Mrs. Scrimsher was not testifying that she had in fact warned the children that the will she would write would be revocable, leaving them to take their chances on a possibility as to what the future might hold. A reading of the record, including her holographic will, shows Leda Scrimsher to be an intelligent, educated, and religious person.

transfer was made and from which the law imputes a fraudulent motive." (*California Consol. Min. Co. v. Manley,* 10 Idaho 786, 81 P. 50; 9 Am.Juris., p. 372, sec. 26.) In other words, if the result accomplished defeats justice, it will amount to fraud. *Id.* at 272–73, 130 P.2d at 684 (emphasis original).

Earlier in that opinion Justice Ailshie reasoned that:

> The contract should be read and understood in the belief that it was entered into in good faith by both parties; and certainly it would not be *good faith,* on the part of the survivor to *give away* the property acquired through the will of the decedent, to prevent the final residuary devisees named in the will from taking.... *Id.* at 271, 130 P.2d at 683 (emphasis original).

That controversy centered around a written mutual agreement of spouses to abide by contemporaneously executed wills. The agreement between the two spouses was much the same as the agreement here entered into by Leda Scrimsher and the children. Implying a good faith provision on the part of contracting parties was not unheard of when the Court later applied it in *Cheney* and again in *Davis.*

It cannot be gainsaid but that Mrs. Scrimsher was commencing to violate her express promise to the children when she listed the Norberg property for sale, and they are patently entitled to pursue appropriate relief.

This case cannot be reconciled with *Wolford, Cheney, Davis,* and *Brown* and those many cases cited in the latter. Once again, we are reminded that:

> The most intolerable evil, however, under which we have lived for the past twenty-five years, has been the changing and shifting character of our judicial decisions, by which we have been deprived of the inestimable benefit of judicial precedents as a safeguard to our rights of person and property.

## II.

The opinion of Justice Bakes, in what appears to be an attempt to devaluate the dissents, is apparently aimed at bolstering a discernibly weak majority opinion.

When Justice Bakes both opens and closes his opinion by observing that this is a "close case," one can readily surmise the interpretation that the plaintiffs very well might have prevailed on *the law,* but he prefers the result that they do not. This he is able to do by putting out of mind that which Justice Huntley has made abundantly clear, that his concern is with *the law,* with Judge Schilling's misconception of the proper *law,* and the misapplication of proper law to the facts. Justice Bakes concludes his opinion with the statement that he believes the *findings* ·are sustained by the record. It is not readily understood which justice he accuses of believing otherwise, yet it is upon such a slender reed that he concurs in the opinion of Justice Shepard who thereby commands a majority.